**DRESSER INDUSTRIES, INC., a Delaware corporation, Plaintiff–Appellee,**

v.

**PYRRHUS AG, formerly known as Pyrrhus Handels AG, Defendant–Appellant.**

No. 89–3533.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1990.

Decided July 8, 1991.

Patrick W. O'Brien, Michael J. Alter, Frank D. Mayer, Jr., Russell R. Eggert, Christopher T. VanWagner, Amy B. Eisenberg, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellee.

Joel Sprayregen, Clifford E. Yuknis, Howard A. Davis, William H. Gifford, Jr., Tami J. Diamond, Shefsky & Froelich, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Pyrrhus Handels AG ("Pyrrhus") appeals the district court's grant of summary judgment in favor of Dresser Industries, Inc. ("Dresser") on its complaint and against Pyrrhus on Count I of its counterclaim, both of which sought a declaratory judgment as to whether the Advisory and After Sales Agreement (the "Contract") between the parties was terminated as of August 1, 1988. Pyrrhus also appeals the district court's dismissal of Counts II through XII (except for Counts V and VII, which were dismissed without prejudice) of its counterclaim for failure to state a claim upon which relief can be granted. We affirm the district judge as to the entry of summary judgment and the dismissal of Counts II, III, VIII, IX, X, XI and XII; we reverse and remand Counts IV and VI.

## I.  FACTUAL BACKGROUND

Pyrrhus, a Swiss corporation, and Dresser, a Delaware corporation, entered into the Contract, effective August 1, 1986, in which Pyrrhus was required to provide aftersales advisory services with respect to sales of Dresser's products to the country of Iran. Relevant provision of the Contract further provided: (1) Pyrrhus was to receive a commission for "orders received and accepted or Contracts entered into during the term of this Agreement" (section 3(a)); (2) Pyrrhus was to be the exclusive agent for Dresser with regard to services provided for by the Contract (section 4); (3) The Contract was for a two-year term ending August 1, 1988 (section 5(a)); and (4) Either party could terminate the Contract upon six months notice at the end of the two-year term or any subsequent one-year term (section 5(a)).

In July 1987, Earl Ternieden, the Vice President–Controller of the Construction Equipment Division of Dresser, and Jack Smith, an independent representative for Pyrrhus, entered into negotiations with regard to extending the Contract. Per these discussions, Ternieden and Smith reached a tentative agreement for an extension of the Contract. Significantly, while Smith was empowered to negotiate for Pyrrhus, he was without authority to sign any new agreement or an extension of the Contract.

On July 24, 1987, Dresser sent a letter to Pyrrhus that contained Dresser's understanding of an agreement reached during Ternieden's and Smith's negotiations to extend the Contract for two years with the following amendment:

"Notwithstanding anything in this Agreement to the contrary, the parties agree that (i) Section 4 of the Agreement and any other express or implied exclusivity provisions are hereby deleted from the Agreement; (ii) the Agreement will be a non-exclusive agreement between Pyrrhus and Dresser with respect to the subject matter therein; and (iii) the consideration/compensation to be received by Pyrrhus from Dresser for services performed under the Agreement shall be negotiated on a case-by-case basis with respect to specific transactions, based upon the services rendered by Pyrrhus. This negotiated compensation provision supercedes [sic] the compensation terms applicable to Pyrrhus' services and [sic] set forth in Section 3."

The letter included a request for confirmation that Pyrrhus agreed to extend the Contract on the terms in the amendment: "If the [sic] you agree with the above, please sign the counterpart of this letter enclosed and return it to me. Upon my receipt of same, we will have an amendment to the Agreement." Dresser sent a second letter two weeks later again asking for confirmation as to whether Pyrrhus would agree to an extension of the Contract as amended:

"Gentlemen:

"Attached are two copies of amendments to the agreement between Dresser and Pyrrhus dated August 1, 1986. This is as per discussions with Jack Smith.

"Would you please arrange to sign both copies and return them to my attention? Upon receipt I will sign and return a final copy for your records."

Pyrrhus responded by letter on August 28, 1987:

"Dear Mr. Ternieden,

"We have received an amendment dated July 24, 1987 to our agreement dated August 1, 1986.

"We were surprised at the contents of paragraph 2 in this amendment. Our understanding was only the extension of the Agreement i.e., only paragraph 1, all other terms and conditions remaining as are.

"We kindly request you to rectify the amendment and send it for signature."

Negotiations over exclusivity continued, and on December 2, 1987, Pyrrhus sent Dresser a signed copy of the July 1987 proposed amendment with a notation in the margin referring Dresser to the attached cover letter. Pyrrhus' cover letter requested that Dresser "disregard the last paragraph of page 1 of the said amendment and confirm your agreement to the exclusivity of the 'Sales and Advisory Agreement' in a separate letter."

Dresser notified Pyrrhus by letter on December 23, 1987, that it could not respond to Pyrrhus' December 2, 1987, letter until after January 1, 1988. On January 25, 1988, Dresser sent Pyrrhus a notice of termination of the Contract effective August 1, 1988.

"With reference to the [Advisory and after Sales Agreement dated August 1, 1986], please be advised that under its terms, Dresser Industries is required to give Pyrrhus AG notice of non-renewal of the agreement prior to the end of January of this year. This is per Section 5(a) of the agreement.

"Please be advised that this letter constitutes notice of Dresser Industries' election not to renew the agreement which expires by its terms on August 1, 1988.

"As has recently been mentioned to one of your representatives, we wish to discuss a new form of relationship subsequent to termination on August 1, 1988. We understand that steps have been taken to have such discussions in the U.S. in February, however, *such discussions are not intended and do not limit this termination notice.*

"A full response to your prior communications to Mr. Ternieden dated December 2, 1987, will be shortly forthcoming. Be assured we will continue to perform our obligations under the current contract."

(Emphasis added). Robert Musgjerd, Dresser's Senior Vice President of Marketing, allegedly called Pyrrhus on or about January 25, 1988 and instructed Jawad Kamel, another Pyrrhus representative, to ignore the termination letter "because Dresser intended to continue its relationship with Pyrrhus but on an improved and expanded basis." However, Pyrrhus never received written confirmation that Dresser wished to disavow the termination letter; nor, despite continued negotiations, did the parties come to an agreement for an expanded relationship.

Dresser filed a complaint on August 22, 1988, seeking a declaratory judgment that the Contract was terminated August 1, 1988, and Pyrrhus responded with a 12-count counterclaim, Count I of which requested a declaratory judgment on the issue of renewal. The other eleven counts of Pyrrhus' counterclaim advanced a variety of theories: Count II, estoppel; Counts III–VIII, breach of contract; Amended Count IX, fraudulent representation; Amended Count X, tortious interference with a prospective business advantage; Amended Count XI, reimbursement of a Swiss withholding tax; and Amended Count XII, violation of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act.

On December 21, 1988, Dresser filed its "Motion for Judgment on the Pleadings as to Plaintiff's Complaint and as to Count I of Defendant's Counterclaim" pursuant to Federal Rule of Civil Procedure 12(c) as well as a "Motion to Dismiss Counts II through XII of Defendant's Counterclaim" pursuant to Rule 12(b)(6). The district judge granted limited discovery prior to ruling on Dresser's motions, and in its memo in opposition to Dresser's "Motion for Judgment on the Pleadings," Pyrrhus relied upon evidence obtained through discovery. Dresser, in its reply memo, requested that the court view the "Motion for Judgment on the Pleadings" as a Rule 56

summary judgment motion in accordance with Rule 12(c).

In its memorandum opinion and order of April 27, 1989, 1989 WL 44571, the district court stated that "[b]ecause the parties rely on exhibits outside the pleadings, this court considers Dresser's motion [for Judgment on the Pleadings] as one for summary judgment under Fed.R.Civ.P. 56." Mem.Op. at 4. Specifically, the district court noted that Pyrrhus relied on affidavits and deposition testimony, and this reliance allowed for the Rule 12(c) motion to be treated as a Rule 56 motion for summary judgment. In addition, the district court found that "[b]oth parties are on notice that the court is treating the motion for judgment on the pleadings as a motion for summary judgment." *Id.* The district judge granted summary judgment in favor of Dresser and against Pyrrhus on the complaint and Count I of the counterclaim and dismissed all counts of Pyrrhus' counterclaim except V and VIII. Pyrrhus filed a motion to alter, amend or vacate, which was denied on August 2, 1989. On October 23, 1989, the district court granted Pyrrhus' motion to voluntarily dismiss Counts V and VIII of its counterclaim without prejudice in order that Pyrrhus might have a final order to appeal to this Court.

## II. SUMMARY JUDGMENT

### A. Existence of Valid Contract[1]

Pyrrhus contends that summary judgment was inappropriate because there were genuine issues of material fact concerning whether there was a meeting of the minds as to their intent to renew the contract.[2] This court, in *Empro Manufacturing Co. v. Ball–Co., Mfg. Inc.*, 870 F.2d 423, 425 (7th Cir.1989), rejected a similar argument, stating that " 'intent' in contract law is objective rather than subjective" and, therefore, not a question of fact. Further, the objective manifestation of a party's intent is determined by the party's written words when the terms are unambiguous. *Id.; see also Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1220–22 (7th Cir.1988); *R.S. Bennett & Co. v. Economy Mechanical Indus., Inc.*, 606 F.2d 182, 186 n. 4 (7th Cir.1979). The documents in the record conclusively demonstrate that the parties were unable to agree as to whether there would be a renewal, or if there were to be a renewal, what its terms would be. At the July 1987 meeting between Ternieden and Smith, they discussed the terms of a renewal agreement. But Smith was without authority to sign for Pyrrhus and was thus unable to commit Pyrrhus to a binding agreement. Moreover, when Ternieden submitted the non-exclusivity amendment (which the letter of August 6, 1987 indicates that he thought Smith approved) to Pyrrhus, Pyrrhus responded,

"We were surprised at the contents of paragraph 2 in this amendment. Our understanding was only the extension of the Agreement i.e., only paragraph 1, all other terms and conditions remaining as are.

"We kindly request you to rectify the amendment and send it for signature."

Thus, it is clear that as of August 28, 1987, the parties did not have a meeting of the minds as to what the terms of the agreement were. Oral negotiations continued, and finally on December 2, 1987, Pyrrhus signed and returned the offer to extend and amend the Contract, but with the notation that "we kindly request you to disregard the last paragraph of page 1 of the said amendment and confirm your agree-

---

**1.** The parties' initial agreement provided that Illinois law governs, and neither Dresser nor Pyrrhus challenges this provision.

**2.** Pyrrhus also contends that the district court improperly granted summary judgment because Dresser failed to file and serve "a statement of uncontroverted facts and issues" in accordance with Rule 12(1) of the U.S. district court for the Northern District of Illinois. However, Dresser's initial motion was for Judgment on the Pleadings under Fed.R.Civ.P. 12(c), and it was Pyrrhus who relied on matters outside the pleadings, thus justifying the conversion to a summary judgment as opposed to judgment on the pleadings. Furthermore, when filing a statement of uncontested facts and issues would not affect the entry of summary judgment, the failure to file the statement does not mandate reversal. *See Beam v. IPCO Corp.*, 838 F.2d 242, 245 n. 2 (7th Cir.1988).

ment to the exclusivity of the 'Sales and Advisory Agreement' in a separate letter." Dresser's reply was that "we will not be able to respond to your letter until after the first of the year [January, 1988]." Dresser's next written communication to Pyrrhus was the formal written notice of termination. Thus, if we were to decide the renewal issue solely on the basis of the parties' intent, as Pyrrhus requests, it is clear from this documentary evidence that there was never a meeting of the minds as to extending or amending the Contract. But as we shall establish below, the parties' intent is immaterial, for Pyrrhus' August 28, 1987 response to Dresser's proposed amendment was a clear rejection and counter-offer as a matter of Illinois law.

While Pyrrhus attempts to characterize its August 28, 1987 letter as "part of the discussions between Pyrrhus and Dresser concerning the agreement already reached," the very language of the letter belies such a representation: "We were surprised at the content of [the amendment dealing with non-exclusivity].... We kindly request you to rectify the amendment and send it for signature." This is clearly a continuation of negotiations regarding the terms of the Contract, and absent clear evidence that the parties had already renewed the Contract, negotiations over such a material term of the Contract constitutes a counter-offer. A "counter-offer rejects the original offer, which expires and may not be 'accepted' later." *Lee v. Voyles*, 898 F.2d 76, 78 (7th Cir.1990) (citing *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.*, 137

Ill.App.3d 550, 558–59, 92 Ill.Dec. 323, 330, 484 N.E.2d 1178, 1185 (1st Dist.1985)). Illinois courts have consistently held that accepting an offer by requesting modification of the terms constitutes a rejection of the original offer and a counter-offer. *See Anand v. Marple*, 167 Ill.App.3d 918, 920–21, 118 Ill.Dec. 826, 828, 522 N.E.2d 281, 283 (3d Dist.1988); *Loeb v. Gray*, 131 Ill. App.3d 793, 799–800, 86 Ill.Dec. 775, 779–80, 475 N.E.2d 1342, 1346–47 (5th Dist. 1985). Pyrrhus requested modification without accepting the offer. The August 28, 1987 letter was a counter-offer, and thus a rejection rather than an acceptance. Since the counter-offer terminated Dresser's offer, Pyrrhus' attempt to accept it on December 2, 1987 was ineffective.[3] While the request in the December 2, 1987 letter that Dresser "disregard the last paragraph of page 1 of the said amendment and confirm your agreement to the exclusivity of the 'Sales and Advisory Agreement' " could be considered a second counter-offer, Dresser's January 25, 1988 termination letter is an unequivocal rejection.

### B. Statute of Frauds

Notwithstanding the legal effect of the written communications between the parties, Pyrrhus contends that the parties reached an oral agreement to renew the Contract in July 1987.[4] Ill.Rev.Stat. ch. 59 ¶ 1 (1989) provides that to avoid the mandates of the Statute of Frauds, an oral contract must be capable of being fully performed within one year of the date the parties entered into the contract.[5] Neither

---

**3.** Hence, we need not address the parties' arguments over whether the somewhat equivocal acceptance in December was effective.

**4.** The alleged oral agreement was between Ternieden and Smith. Since Smith's authority was limited, extending only to negotiate but not to finally accept an agreement (Dresser alleges this and Pyrrhus fails to deny it), any understanding reached in July 1987 was subject to subsequent ratification by Pyrrhus as well as Dresser.

Pyrrhus further alleges that its August 28, 1987 letter was in response to an instruction from Musgjerd "to send a letter confirming renewal on the basis discussed between Musgjerd and Kamel." The letter makes no reference to any oral discussions; rather, it specifically states that it is in response to Pyrrhus having

"received an amendment dated July 24, 1987...." Instead of "confirming renewal," as Musgjerd allegedly instructed orally, the letter requests that Dresser "rectify the amendment and send it for signature." Thus, the letter evinces the lack of an agreement as of August 28, 1987. As discussed above, Dresser's offer was terminated by the August 28, 1987 letter.

**5.** Pyrrhus argues that if the Statute of Frauds were applicable, the district judge should have applied the Illinois codification of Uniform Commercial Code § 2–201 (Ill.Rev.Stat. ch. 26, ¶ 2–201) rather than Ill.Rev.Stat. ch. 59 ¶ 1. This argument is meritless, for ¶ 2–201(1) states that it relates to "a contract for the sale of goods...." The Contract between Dresser and Pyrrhus was for services alone rather than

party denies that the alleged oral contract in this case is incapable of being performed within one year. Therefore, we agree with the district court that even if there was an oral agreement to renew, it would be invalid as a matter of law because it would violate the Illinois Statute of Frauds' limitation of enforceable oral contracts to those contracts performable within one year.

■ Pyrrhus asserts, however, that Dresser waived the Statute of Frauds defense, for Dresser failed to raise this affirmative defense in its answer to Count I of the counterclaim as required under Federal Rule of Civil Procedure 8(c). "As a general matter, plaintiffs [Pyrrhus in this case] are correct insofar as failure to plead an affirmative defense results in a waiver of that defense. [Citation omitted] *But when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal.*" *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir.1987) (emphasis added); *see also Bull's Corner Restaurant, Inc. v. Director of Federal Emergency Management Agency*, 759 F.2d 500, 502 (5th Cir.1985) (" 'Where [an affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise, ... technical failure to comply precisely with Rule 8(c) is not fatal.' " (Citation omitted)). In the instant case, Dresser raised its Statute of Frauds defense for the first time in its reply brief on its "Motion for Judgment on the Pleadings."[6] While this affirmative defense technically should have been raised in Dresser's Answer to Count I of the counterclaim, Pyrrhus nevertheless received a full opportunity to respond when it filed an "Additional Memorandum" in the trial court. Since the "parties argue[d the] affirmative defense in the district court," we refuse to hold that the technical pleading error is fatal.

■ Pyrrhus advanced six further arguments in asserting that the Statute of Frauds is inapplicable, none of which has substance.[7] Pyrrhus' initially contends that the July 1987 renewal letter and the subsequent August 1987 "signed" cover letter, removed this action beyond the Statute of Frauds. This contention cannot be supported because "a contract which is partly oral and partly written is considered oral for its legal effect." *Koch v. Illinois Power Co.*, 175 Ill.App.3d 248, 255, 124 Ill.Dec. 461, 466, 529 N.E.2d 281, 286 (3d Dist.1988); *see also Gilliland v. Allstate Ins. Co.*, 69 Ill.App.3d 630, 633, 26 Ill.Dec. 444, 388 N.E.2d 68 (1st Dist.1979) (finding that "even if there is some written evidence of the alleged oral contract, the contract

---

goods regardless of the fact that the services related to goods because the goods were sold to third parties, not to Pyrrhus. Moreover, even if we were to agree that ¶ 2–201 were applicable, Pyrrhus' claim would still fall. ¶ 2–201(3) states:

"A contract which does not satisfy the requirements of subsection (1) [less than $500 or in writing] but which is valid in other respects is enforceable

\* \* \* \* \* \*

(b) "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, *but the contract is not enforceable under this provision beyond the quantity of goods admitted. . . .*"

(Emphasis added). Pyrrhus argues that since Ternieden admitted that "[t]here was an agreement reached with Mr. Smith under which that contract would be extended on a nonexclusive basis," ¶ 2–201(3)(b) takes the oral agreement out of the Statute of Frauds. Since Ternieden's "admission" fails to mention a "quantity of goods," we fail to see how this section aids Pyrrhus.

**6.** In its Answer to Count I of the counterclaim, Dresser put Pyrrhus on notice that it might raise affirmative defenses when it stated,

"Dresser has filed along with this Answer a Motion for Judgment on the Pleadings addressed to Count I of Pyrrhus' Counterclaim and to the Complaint. Dresser therefore expressly reserves its right to allege any and all affirmative defenses which it may have to Count I, until such time as the Court has ruled on that Motion."

While such shoddy pleading should be discouraged (there is no procedure for reserving a right to plead affirmative defenses at a latter date) under the circumstances in this case, there was no unfair surprise to Pyrrhus.

**7.** Pyrrhus' shotgun approach to this appeal belies its statement that it "is mindful of the admonition in this Court's *Practitioner's Handbook For Appeals* that appellants ordinarily should not present more than three or four errors."

still falls within the Statute of Frauds"). Pyrrhus quotes *Yorkville National Bank v. Schaefer,* 71 Ill.App.3d 137, 27 Ill.Dec. 263, 266, 388 N.E.2d 1312, 1315 (2d Dist. 1979) for the proposition that "[a] writing may satisfy the statute of frauds even though it is not in and of itself the contract in question." *Yorkville* also states, however, that "no particular form of language is required *as long as the intention of the parties can be established." Id.* 27 Ill.Dec. at 265, 388 N.E.2d at 1314. As demonstrated above, the writings at issue, when viewed together, fail to establish the meeting of the minds as to the basic details of the agreement, which is obviously necessary to constitute a binding contract. Thus, the letters are inadequate to take this case out of the statute of frauds.

■ Pyrrhus' second argument is that the Statute of Frauds is not applicable where there has been partial performance. Application of the partial performance doctrine is warranted where a party has performed in reliance on the other party's promises or conduct, *Payne v. Mill Race Inn,* 152 Ill.App.3d 269, 277, 105 Ill.Dec. 324, 330, 504 N.E.2d 193, 199 (2d Dist. 1987), and where it is impossible to restore the parties to their original position. *Mariani v. School Directors of District 40,* 154 Ill.App.3d 404, 407, 107 Ill.Dec. 90, 92, 506 N.E.2d 981, 983 (3d Dist.1987). "Only where the parties do not have equal knowledge, or access thereto, or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other will a person be found to have justifiably relied upon the other's representations." *Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1058 (7th Cir.1988) (quoting *Luciani v. Bestor,* 106 Ill.App.3d 878, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (1982)). We are of the opinion that under the *Runnemede* elements of reliance, the doctrine of partial performance is inapplicable. The parties had equal knowledge and access to the information involved in the negotiations, and there is no demonstration of the re-

quired "peculiar circumstances" that would justify reliance. In addition, the explicit terms of the termination notice of January 25, 1988, warned Pyrrhus not to rely on oral statements: "We wish to discuss a new form of relationship *subsequent to termination* on August 1, 1988.... [S]uch discussions are not intended and *do not limit* this termination notice." (Emphasis added). Hence, any reliance was unjustified. We note that even if there were partial performance based on reasonable reliance, the reasonableness would have ended upon notice of this suit, which was filed 22 days after termination of the Contract on August 1, 1988. Pyrrhus failed to allege that it incurred damages for performance between August 1, 1988, and the date it received notice of the suit or to request specific damages for such performance,[8] which is the remedy that would have returned Pyrrhus to its position prior to the purported reliance.

Pyrrhus' third assertion is that if the alleged oral contract is not upheld, Ternieden's signature on the August 6, 1987, letter amounts to fraud because the letter states that Ternieden and Smith reached an agreement. However, Pyrrhus completely ignores the contents of the letter. The letter states, "[t]his is *as per discussions* with Jack Smith." (Emphasis added). The letter fails to state that there was a *contract* agreed to with Jack Smith. Rather, it presented Dresser's understanding of the state of the negotiations and specifically requested a return of two signed copies of Dresser's proposed amendments, and "[u]pon receipt, I will sign and return a final copy for your records." These facts are indicative of on-going negotiations, certainly not fraud. We fail to understand how Pyrrhus can rely upon this letter as evidence of a binding Contract when the letter clearly sets forth an unfulfilled condition, namely that each party to the contract must sign and approve the renewal instrument.

---

8. Indeed, alleging damages for that period clearly would have demonstrated that Pyrrhus could be returned to its original position through pe-

cuniary compensation without a declarative judgment holding that the Contract was renewed.

## C. Termination

■ Because Pyrrhus' counter-offer of August 28, 1987, in effect constituted a rejection of Dresser's July 1987 offer of renewal, and the Statute of Frauds prevents the alleged oral agreement from becoming effective, Dresser was free to terminate the Contract in accordance with its terms. Dresser chose to do so January 25, 1988, through the following letter:

"With reference to the [Advisory and after Sales Agreement dated August 1, 1986], please be advised that under its terms, Dresser Industries is required to give Pyrrhus AG notice of non-renewal of the agreement prior to the end of January of this year. This is per Section 5(a) of the agreement.

"Please be advised that this letter constitutes notice of Dresser Industries' election not to renew the agreement which expires by its terms on August 1, 1988. "As has recently been mentioned to one of your representatives, we wish to discuss a new form of relationship subsequent to termination on August 1, 1988. We understand that steps have been taken to have such discussions in the U.S. in February, however, *such discussions are not intended and do not limit this termination notice.*

"A full response to your prior communications to Mr. Ternieden dated December 2, 1987, will be shortly forthcoming. Be assured we will continue to perform our obligations under the current contract."

(Emphasis added). Pyrrhus alleges that before the notice arrived, Musgjerd, Dresser's Senior Vice President of Marketing, called and advised Pyrrhus to disregard this termination notice "because Dresser intended to continue its relationship with Pyrrhus on an expanded basis." Pyrrhus fails to cite any case law for its proposition that a mere oral instruction to disregard a written termination makes the written notice of termination ineffective. Moreover, the notice that Dresser intended to continue negotiating with Pyrrhus, but that "such discussions are not intended and do not limit this termination notice" (January 25, 1988 termination letter) makes any reliance on the oral instruction objectively unreasonable. Thus, we hold that Dresser terminated its Contract with Pyrrhus as of August 1, 1988.

## III. ESTOPPEL

■ Count II of Pyrrhus' counterclaim alleges that Dresser is estopped from denying the existence of an agreement to renew the Contract.[9] Pyrrhus argues that the district court erred in dismissing this Count under Rule 12(b)(6) because Pyrrhus stated a claim of estoppel upon which relief could be granted. For Pyrrhus to assert a valid claim for estoppel under Illinois law, Pyrrhus must establish the following: (1) Dresser made misrepresentations that induced reliance by Pyrrhus; (2) Dresser had knowledge, either actual or implied, that the representations when made were untrue; (3) Dresser intended for Pyrrhus to rely upon the misrepresentations; (4) Pyrrhus relied upon the misrepresentations without knowledge of or without reasonable means of knowing the true facts; and (5) Pyrrhus would be prejudiced if Dresser is allowed to deny the Contract. *UIDC Management, Inc. v. Sears, Roebuck & Co.*, 167 Ill.App.3d 81, 117 Ill.Dec. 813, 816, 520 N.E.2d 1164, 1167 (1st Dist.1988).

■ Pyrrhus alleges that it relied upon the following Dresser representations that the Contract was renewed:

1) The alleged oral agreement between Ternieden and Smith in July of 1987.
2) Dresser's July 24, 1987 letter offering renewal with an amendment removing the exclusivity clause from the Contract.

---

9. The district court declined to address the Rule 12(b)(6) motion to dismiss this Count as a motion for summary judgment "because Pyrrhus has not relied on matters outside the pleadings in its opposition to Dresser's motion to dismiss Count II...." Pyrrhus assigns this as an additional error, since it claims it relied upon an affidavit and deposition in defending the motion. Nonetheless, the material from the deposition and affidavit merely repeated the allegations contained in the pleadings. The district judge's decision to decide Count II under the motion to dismiss was not erroneous and certainly not reversible error.

3) Dresser's August 6, 1987 letter requesting that Pyrrhus sign two copies of the agreement.

4) An alleged conversation in August 1987 wherein Musgjerd allegedly instructed Kamel to send a letter affirming renewal on an *exclusive* basis, but with Dresser remaining free to negotiate directly with Iranian customers or their representatives.

5) An alleged conversation in November 1987 wherein Musgjerd allegedly instructed Kamel to sign the July 24, 1987 renewal agreement and return it along with a letter requesting that Dresser delete the non-exclusivity agreement.

6) An alleged conversation in January 1988 prior to Pyrrhus' receipt of the termination letter wherein Musgjerd allegedly informed Kamel that he should disregard the notice.

Pyrrhus has failed to demonstrate or even allege that Dresser was unwilling to extend the Contract on the amended terms if Pyrrhus had accepted the offer. Thus, the first of Dresser's six "representations" listed above, the alleged oral agreement of July 1987, falls short of being a *mis*representation, as do the second and third, the letters requesting Pyrrhus' signature on the amendment. Consequently, the first three grounds fail to support estoppel. The fourth representation, the alleged instruction to send a letter affirming renewal on an *exclusive* basis, cannot provide grounds for reliance, as Pyrrhus is now alleging a renewal on *non-exclusive* terms. Moreover, Pyrrhus' August 28, 1987 letter purportedly in response to Musgjerd's instruction failed to confirm renewal; rather, as established above, it constituted a rejection of Dresser's offer and a counter-offer as a matter of law. Pyrrhus' fifth allegation fails to constitute a representation: The alleged conversation occurred after Pyrrhus terminated Dresser's offer by making a counter-offer, and Kamel's recitation of Musgjerd's purported instruction to sign the amendment and request changes fails to allege that Musgjerd stated the signature would constitute a renewal. Hence no representation is alleged. The

final representation is somewhat more troublesome, but even accepting as true the allegation that Musgjerd instructed Kamel to disregard the termination notice, it still fails to establish estoppel because the alleged oral representations were inconsistent with the written termination notice. In view of the question as to the termination or continuation of the contract, Pyrrhus would have been wise to have insisted on documented clarification of the status thereof. Because Pyrrhus failed to obtain written clarification, it now attempts to rely upon the alleged oral representation to overcome the effect of the termination letter. There is no basis in case law or logic for relying upon an oral representation that a contract is still in effect, particularly when the party has in its possession a written notice of termination. Thus, Pyrrhus has failed to support its claim for estoppel.

## IV. BREACH OF CONTRACT

Counts III, IV, VI and VIII of Pyrrhus' counterclaim alleged that Dresser breached its contract with Pyrrhus. Pyrrhus argues that the district court erred in dismissing these counts under Rule 12(b)(6) because Pyrrhus stated a claim for breach of contract upon which relief could be granted.

### A. Count III

▮ Pyrrhus seeks compensation in this Count for the 1985 sale of 40 Dresser Crawler Dozers to the National Iranian Oil Company. These sales were facilitated by International Trading and Construction Limited and Steinenkreuz AG ("SK"). The Contract between Dresser and Pyrrhus specifically provides for compensation to Pyrrhus "for orders received and accepted or Contracts entered into during the terms of this Agreement...." Count III fails to state a breach of contract, for it seeks commissions for sales made by non-parties in 1985 before the effective date of the Contract (August 1, 1986).

### B. Counts IV and VI

▮ Under Count IV Pyrrhus alleges (1) that during 1987 the Ministry of Mines

and Metals of Iran requested information from Dresser regarding the purchase of certain earth-moving equipment (TD–40 Crawler Dozers); (2) that during 1987 and 1988 the Ministry informed Dresser that it intended to place orders for 140 TD–40 Crawler Dozers; (3) that Dresser and the Ministry agreed on a purchase price of about $255,000 for each Dozer; and (4) that a letter of credit in the amount of $4.3 million was issued to secure payment. In Count VI Pyrrhus claims that it performed services culminating in the sale of twenty trucks and parts to the National Iranian Steel Company. Both Counts allege that sales contracts were formed and that shipment will be made in the future, but neither Count specifies the date of the commencement of the contracts.

The district judge dismissed Counts IV and VI on the ground that:

"[Counts IV and VI state claims] for commissions due on future shipments for sales that have not been consummated. The agreement expressly provides Pyrrhus is entitled to payment within fifteen days after Dresser is paid. Under the agreement, *the goods must have been shipped into Iran.* These facts are not alleged in Counts IV and VI. *Pyrrhus does not allege facts demonstrating that all conditions precedent to payment have been fulfilled.*"

Mem.Op. at 16 (emphasis added). This conclusion was based on an improper interpretation of the Contract, which states:

"In consideration of the services provided by Pyrrhus to Dresser or the applicable Dresser Subsidiary, Dresser will, subject to the terms, conditions and rights herein, pay or cause to be paid by the relevant Dresser Subsidiary to Pyrrhus compensation as follows: 5% of the net FOB value of any shipment of the Products (except spare parts) of whatever origin made by Dresser or a Dresser Subsidiary to Iran and *pursuant to either orders received and accepted or Contracts entered into during the term of this Agreement,* except that such percentage shall be 3% instead of 5% for

spare parts included in the definition of Products. Subject to the other terms, conditions and rights herein, *Dresser will pay or cause to be paid to Pyrrhus the foregoing amounts within fifteen (15) days of receipt of payment by Dresser or the relevant Dresser Subsidiary in respect of any order or contract with respect to which such fee is due."*

(Emphasis added). The district judge apparently interpreted the qualification that commissions are due only on products actually shipped ("5% of the net FOB value of any shipment of the Products ... to Iran") and the time payment is due ("within fifteen (15) days of receipt of payment by Dresser") as conditions that must have been fulfilled during the terms of the Contract in order for Dresser to owe Pyrrhus commissions. But it is clear from the language quoted above that if "orders [are] received and accepted or Contracts entered into" during the term of the instrument, Dresser owes Pyrrhus a commission for the sales. The factors requiring actual shipment of the products into Iran and payment "within fifteen (15) days of receipt of payment by Dresser" define merely *when* payments must be made to Pyrrhus.

We are of the opinion that the district judge erred in dismissing Counts IV and VI on the grounds that "Pyrrhus does not allege facts demonstrating that all conditions precedent to payment have been fulfilled." While the payments may not yet have been due under the Contract because of shipments to Iran or payments to Dresser that are as yet unfulfilled, Pyrrhus' counterclaim was adequate to overcome a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, since Pyrrhus may eventually be entitled to commissions for the sales. As Dresser has refused to compensate Pyrrhus for the sales alleged in Counts IV and VI, Pyrrhus is entitled to seek relief through a declaratory judgment action to determine whether Dresser owes Pyrrhus payments when Dresser has shipped the products and received payment. Allowing

limited discovery [10] for the sole purpose of ascertaining the dates of the contracts alleged in Counts IV and VI will either demonstrate that Pyrrhus is entitled to commissions or, in the alternative, establish that Pyrrhus' claims are invalid. For these reasons, we are of the opinion that the district court must allow limited discovery on remand. A "complaint should not be dismissed unless it appears that appellant could 'prove no set of facts in support of his claim which would entitle him to relief.'" *Jenkins v. McKeithen*, 395 U.S. 411, 422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969) (citation omitted). The district court erred in dismissing Counts IV and VI because if the evidence establishes that these contracts were confirmed prior to August 1, 1988, Pyrrhus would then be entitled to commissions. We remand these Counts for the limited purpose of permitting discovery to ascertain whether the alleged sales were made prior to August 1, 1988, and if so, the amount due Pyrrhus, if any, in those circumstances where Dresser has made shipment and received payment for the products.

### C. Count VIII

■ Pyrrhus seeks commissions for lost sales in Count VIII. It alleges that in a separate *pro forma* agreement,[11] Dresser agreed to pay a higher percentage for sales of certain parts and machines to the Ministry of Jahad Sazandegi in Iran. The contract with the Ministry of Jahad Sazandegi required that any equipment shipped must have been produced in the United States, but Dresser shipped equipment manufactured in Poland. Because of this substituted equipment, the Ministry of Jahad Sazandegi allegedly refused to purchase additional equipment that it otherwise would have purchased—equipment that Pyrrhus alleges was covered by the *pro forma* agreement. But Pyrrhus fails to cite any case law or legal argument for its assertion that it is entitled to compensation for sales lost

as a result of Dresser's alleged misrepresentations as to the origin of its equipment, so we need not address the merits of the issue of lost sales.

"We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues). *See, e.g., United States v. Brown*, 899 F.2d 677, 679 n. 1 (7th Cir. 1990); *United States v. Petitjean*, 883 F.2d 1341, 1349 (7th Cir.1989); *United States v. Williams*, 877 F.2d 516, 518–19 (7th Cir.1989); Fed.R.App.P. 28(a)(4)." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991). Thus, we hold that Pyrrhus has waived the issue of lost sales, and we affirm the district court's dismissal of this claim.

### D. Procuring Cause

■ Pyrrhus contends that in addition to its claims under the Contract, it is entitled to commissions for Counts III, IV and VI under the procuring cause rule. The procuring cause rule provides that a salesperson may be entitled to receive commissions on future sales if the salesperson expended effort to make the sale. *Furth v. Incorporated Publishing Corp.*, 823 F.2d 1178, 1181 (7th Cir.1987). When the parties' relationship is governed by a contract, as here, the procuring cause rule is inapplicable: "the terms of the contract control, and it is not our function to rewrite them according to our own notions of fairness." *Scheduling Corp. of America v. Massello*, 151 Ill.App.3d 565, 571, 104 Ill. Dec. 944, 949, 503 N.E.2d 806, 811 (1st Dist.1987); *see also Furth*, 823 F.2d at 1181. Thus, the district judge properly held that the procuring cause rule is inapplicable.

### V. FRAUD

■ Count IX of Pyrrhus' amended counterclaim seeks commissions for the

---

**10.** The district court limited discovery to the issues of termination and renewal of the Contract and stayed all other discovery.

**11.** A *pro forma* agreement refers to one "based upon assumed or anticipated facts." Black's Law Dictionary 1091 (5th Ed.1979). The "assumed or anticipated facts" in this case were sales that never occurred.

same lost sales alleged in Count VIII (sales purportedly lost as a result of Dresser's representations to Iran's Ministry of Jahad Sazandegi that the equipment manufactured in Poland was in fact manufactured in the United States) under a theory of fraud. Pyrrhus asserts that in 1986 the Ministry and Dresser entered into an agreement by which Dresser was to supply 100 Crawler Dozers of United States origin to the Ministry. If the initial 100 dozers operated satisfactorily, the Ministry allegedly intended to purchase 400 additional dozers in 1986 and 500 dozers per year for five years thereafter. The Ministry supposedly decided to cancel its plans to purchase additional dozers when it became aware of the fact that the 100 initial dozers were manufactured in Poland. Pyrrhus claims that as a result of Dresser's alleged misrepresentation to the Ministry as to the origin of the equipment, Pyrrhus lost commissions on additional sales.

"Illinois law requires that in an action for fraud, 'plaintiff must show a false statement of material fact made by defendant, defendant's knowledge or belief that the statement was false, *defendant's intent to induce plaintiff to act*, and *action by plaintiff in justifiable reliance on that statement*, and damage to plaintiff resulting from such reliance.'" *Commercial Credit Equipment Corp. v. Stamps*, 920 F.2d 1361, 1366 (7th Cir.1990) (emphasis added). Pyrrhus alleges that it "relied on the representation that the products were of United States of America origin by continuing to perform after sales and advisory services for Dresser in connection with the sale of Crawler Dozers." Since Pyrrhus was bound to perform these services under the terms of its contract with Dresser, it has failed to allege that it has changed its position in reliance on Dresser's representations. Additionally, Pyrrhus has failed to allege that Dresser intended to motivate Pyrrhus to act in any way. Thus, the district court's action dismissing the Count

asserting fraud was proper, for it failed to state a claim upon which relief can be granted.[12]

## VI. TORTIOUS INTERFERENCE

■ Count X of Pyrrhus' amended counterclaim constitutes a third theory under which Pyrrhus attempts to recover commissions for lost sales of Dresser Crawler Dozers, this time alleging tortious interference with Pyrrhus' prospective business advantage. Dresser asserts that

"(1) it had a reasonable expectation of *continuing* a valid business relationship with the Ministry of Jahad Sazandegi,

"(2) Dresser knew of this relationship,

"(3) Dresser intentionally and maliciously falsified a document which interfered with this relationship, and

"(4) Pyrrhus has been damaged by Dresser's interference."

(Emphasis added). Since this Count alleges an already existing relationship, it is a claim for tortious interference with a contract rather than a prospective business advantage. Under Illinois law,

"to make out a claim for tortious interference with contract, the plaintiff must show (1) he had an enforceable contract; (2) of which the defendant knew; and (3) defendant induced the third party to breach that contract; (4) successfully; (5) resulting in damages."

*Feldman v. Allegheny International, Inc.*, 850 F.2d 1217, 1224 (7th Cir.1988). To state the requirements of the claim is to demonstrate the invalidity of Pyrrhus' allegation. Pyrrhus' contract was with Dresser rather than the Ministry of Jahad Sazandegi; Pyrrhus' prospective commissions would have come from Dresser rather than the Ministry; Dresser's alleged misrepresentations induced the Ministry to reconsider and reject future contracts with *Dresser* rather than *Pyrrhus*. Thus, Pyrrhus had no ongoing business relationship with the

---

12. The district judge found that Pyrrhus failed to plead the circumstances constituting fraud with sufficient particularity to conform to the requirements of Rule 9(b) and that Pyrrhus lacked standing to raise the fraud claim, since

Dresser made the representations to the Ministry of Jahad Sazandegi. Since Pyrrhus failed to allege the necessary elements of fraud, we need not address these questions.

Ministry or a legitimate expectation of one from Dresser's sale of equipment. Pyrrhus' only business relationship, within the tortious interference doctrine, was with Dresser. Pyrrhus, therefore, has failed to state a claim for tortious interference upon which relief can be granted.

## VII. BREACH OF CONTRACT WITH REGARD TO SWISS WITHHOLDING TAX

■ Count XI of Pyrrhus' amended counterclaim alleges a breach of contract with regard to the incurring of a Swiss withholding tax. The Count alleges that "Dresser requested that Pyrrhus deposit certain payments due under the Agreement [in a numbered account in] Credit Suisse in Geneva. SK [a company affiliated with Pyrrhus], on behalf of Pyrrhus, made the requested payments to this account."[13] Pyrrhus further alleges that Dresser "agreed to comply with all requirements of Swiss tax law so as to receive the most favorable tax treatment [for this transaction]." Apparently the payments would have been tax deductible business expenditures under Swiss law if the owner of the account had signed a letter stating that it was "not the legal or beneficial owner of the paying company or closely connected in another way." But absent the signature, SK will allegedly have to pay 35% of the sum of the payments in Swiss anticipatory taxes, and Pyrrhus will have to indemnify SK. As the district court noted, however, "Pyrrhus alleges no breach of any duty by Dresser, contractual or otherwise, upon which the court may award damages.... [The counterclaim] does not inform Dresser of either the legal basis of its liability or the facts establishing its liability to Pyrrhus." The bald assertion that there was an agreement "to comply with all requirements of Swiss tax law so as to receive the most favorable tax treatment," is too general in form and too ambiguous to allege

an enforceable contract, since it fails to state the duties of the parties or the consideration to support the agreement. Accordingly, the district court did not err in dismissing Count XI of Pyrrhus' counterclaim for failure to state a claim for breach of contract.

## VIII. RICO VIOLATION

■ Count XII of Pyrrhus' amended counterclaim alleges a claim under 18 U.S.C. §§ 1961(1), 1962(c) and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Pyrrhus contends that:

> "In furtherance of its schemes to defraud Pyrrhus, which are described in Counts I, II and IX above, Dresser used, or caused to be used, on two or more occasions, United States mail services in violation of 18 U.S.C. § 1341 and interstate or foreign wire communications in violation of 18 U.S.C. § 1343."

A civil action under RICO may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter...." 18 U.S.C. § 1964(c). As we have found no schemes to defraud Pyrrhus in Counts I, II or IX, and no injury to Pyrrhus, Pyrrhus is without standing to allege this counterclaim. Pyrrhus' purported injury, continuing to perform services for Dresser, was required under the Contract at issue here. If Pyrrhus indeed performed services after August 1, 1988, such actions were objectively unreasonable, as Pyrrhus possessed a written termination notice uncontroverted by subsequent documents. Since Pyrrhus has failed to establish standing for its RICO claim, the district court properly dismissed it.[14]

## IX. MOTION TO ALTER, AMEND OR VACATE

Pyrrhus argues that the district court erred in denying Pyrrhus' motion to alter,

---

**13.** The counterclaim as well as Pyrrhus' briefs fail to explain why Pyrrhus would be making payments to Dresser under a contract that requires Dresser to pay commissions to Pyrrhus.

**14.** The district judge found that Pyrrhus failed "to plead sufficient facts to allege the existence

of a RICO enterprise" and failed "to present facts sufficient to allege a pattern of racketeering activity." Since we find that Pyrrhus is without standing to assert a RICO claim, we refuse to address its arguments.

amend or vacate judgment. Such motions "must clearly establish either a manifest error of law or fact or present newly discovered evidence." *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986); *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd* 736 F.2d 388 (7th Cir. 1984). Furthermore, the purpose of such motions cannot be to present new legal theories. *Publisher's Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985).

Pyrrhus argues that the district judge improperly rejected its arguments that (1) the court applied the wrong Statute of Frauds (an argument raised for the first time on the Motion to Amend or Alter); (2) the court erred in converting Dresser's motion for judgment on the pleadings into a motion for summary judgment; and (3) the court erred in dismissing Pyrrhus' claim of tortious interference with a prospective business relationship. Pyrrhus failed to establish either a manifest error of law or facts or present newly discovered evidence in the arguments it advanced in its motion, and we have rejected these arguments above. Accordingly, the district court action in refusing to grant Pyrrhus' motion was proper.

## X. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Dresser on its complaint and against Pyrrhus on Count I of its counterclaim as well as the district court's dismissal of Counts II, III, VIII, IX, X, XI and XII are affirmed. The dismissal of Counts IV and VI is reversed, and these Counts are remanded for the limited purpose of allowing discovery to determine whether the sales alleged were made during the terms of the Contract, and if so, the amount of commissions due Pyrrhus, if any, upon Dresser's

---

shipment of the products and receipt of payment.