**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ELLIOTT'S ENTERPRISES,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.                                                                    No. 97-1865

FLYING J, INCORPORATED; CFJ
PROPERTIES,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-97-193)

Argued: January 26, 1998

Decided: April 6, 1998

Before ERVIN and WILLIAMS, Circuit Judges, and GOODWIN,
United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Henry Smallenberg, AYERS & STOLTE, Rich-
mond, Virginia, for Appellant. Douglas R. Cox, GIBSON, DUNN &
CRUTCHER, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:**
F. Joseph Warin, Eugene Scalia, GIBSON, DUNN & CRUTCHER,
L.L.P., Washington, D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Elliott's Enterprises, Inc. (Elliott's) operates two Exxon retail outlets off Interstate 95 in Carmel Church, Caroline County, Virginia. In 1994, Elliott's CEO Carroll Elliott became aware that Flying J, Inc. (Flying J), a Utah corporation, planned to build a travel plaza directly across the street from an Elliott's retail outlet. Flying J proposed that the travel plaza would include a restaurant, convenience store, and fueling facilities for both cars and trucks. Before beginning construction, Flying J invited community members to an open house to discuss Flying J's plans. Mr. Elliott became convinced that Flying J's travel plaza would increase overall traffic volume at the highway interchange, thereby increasing revenues for all retail outlets at the intersection, including his own. Mr. Elliott wrote a letter to Caroline County authorities endorsing Flying J's proposal and urging its approval. J.A. at 62-63. In his letter, Mr. Elliott explained: "Speaking of pricing on the market: I have been faced with this pricing strategy on the eastside. . . . I am the only dealer-operated business on the exit. . . . All the rest of the businesses buy petroleum as a jobber or marketer. This gas is normally priced 6 to 15 cents cheaper tha[n] I can buy it. The truck stops and other jobbers, Amoco and Citgo, sell millions of gallons of petroleum at a much higher margin of profit than I do. However, I am still in business. . . . This new plaza can only move my gross business up. . . . I can grow." J.A. at 62-63. Mr. Elliott forwarded a copy of his letter to Craig Call, Flying J's community liaison. J.A. at 61.

In August 1994, Flying J wrote Mr. Elliott that it had received zoning approval for the site and would begin building in 1995. J.A. at 44. By May 1995, Flying J had obtained a building permit and begun construction directly across the street from and in plain view of the Elliott's outlet. J.A. at 47, 50-51, 129. After eight months of construction costing millions of dollars, Flying J opened for business in Janu-

2

ary 1996. J.A. at 43, 47. Flying J sold petroleum products more profitably than Elliott's, as Mr. Elliott had expected. J.A. at 62-63. Within a few months, Mr. Elliott realized that the increased traffic on the interchange did not have the desired effect on his business. In late 1996, Mr. Elliott allegedly discovered that either Flying J or its affiliates were "refiners" of crude oil. Cf.VA. CODE ANN.§ 59.1-21.16:2(A) (Michie 1997) (prohibiting petroleum refiners from operating retail outlets within a one and one-half mile radius of existing retail outlets). Further, Mr. Elliott allegedly discovered that CFJ Properties (CFJ) owned the property on which Flying J operated its retail outlet and that CFJ's partners included oil refiners, one of which supplied Flying J with petroleum products. Despite his earlier support for Flying J's efforts, Mr. Elliott decided to sue for legal and equitable relief. On December 26, 1996, Elliott's filed a bill of complaint against Flying J and CFJ in Caroline County Circuit Court. After Elliott's amended its complaint, Flying J and CFJ timely removed the action to federal court based on diversity between the parties.

In its amended complaint, Elliott's claimed that both Flying J and CFJ were petroleum refiners or were affiliated with such refiners and that they operated a retail outlet within one and one-half miles of Elliott's franchised outlets in violation of the Virginia Petroleum Products Franchise Act. Elliott's sought injunctive relief enjoining Flying J and CFJ from operating the retail outlet, actual damages, attorney fees, and other unspecified relief. J.A. at 5-7. Flying J and CFJ countered with a motion to dismiss, or in the alternative, a motion for summary judgment. Flying J and CFJ contended that the Act extended only to franchisee's relationships with their own franchisors and that the doctrines of acquiescence and laches barred Elliott's claim. J.A. at 9-39. At a hearing held on May 29, 1997, the district court granted Flying J and CFJ's motion for summary judgment. J.A. at 140-41. By order dated May 30, 1997, the district court held that the Virginia Petroleum Products Franchise Act does not protect a franchise dealer from encroachment by franchisors or refiners other than the franchisor from whom the dealer obtained its franchise. In the alternative, the court granted summary judgment based on Elliott's laches. J.A. at 144. On June 6, 1997, the Virginia Supreme Court issued an opinion holding that the Virginia Petroleum Products Franchise Act protects franchises from encroachment by all franchisors and refiners, not just those from whom the franchise dealer

3

obtained its franchise. See Crown Central Petroleum Corp. v. Hill, 488 S.E.2d 345 (Va. 1997). Accordingly, the district court vacated its May 30, 1997 order. J.A. at 145. After a conference with the parties, the court entered a final order granting summary judgment on June 19, 1997. J.A. at 146. In its order, the district court concluded that laches barred Elliott's claim for legal and equitable relief.

The Court reviews a district court's grant of summary judgment de novo. See Shafer v. Preston Mem'l Hosp. Corp. , 107 F.3d 274, 276 (4th Cir. 1997) (citing Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988)). In reviewing a grant of summary judgment, the Court may affirm on any legal ground supported by the record, and the Court is not limited to the grounds relied on by the district court. Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). However, summary judgment is proper only when material facts are not in dispute. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether material facts are in dispute, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To avoid summary judgment, the nonmovant's evidence must be of sufficient quantity and quality as to establish a genuine issue for trial. Id.

Elliott's bill of complaint requested legal damages and attorney fees, as well as injunctive relief. In granting Flying J and CFJ's summary judgment motion, the district court correctly reasoned that laches barred Elliott's claim for equitable relief:"[A]fter the CEO of Elliott advocated zoning approval and publicly supported building the truck stop, and then [sat] idly by while the defendant spent 9 million dollars building it, and then waited to see the effect that the truck stop would have on his company's profits. . . . [Elliott's] cannot be heard to complain that the same . . . truck stop violates its rights under the Petroleum Products Franchise Act." J.A. at 141. However, laches generally is regarded as an inappropriate defense to claims for legal damages. See City of Portsmouth v. City of Chesapeake, 349 S.E.2d 351, 354 (Va. 1986) ("A proceeding to enforce a legal right is not subject to the equitable defense of laches.") (citing Grenco Real Estate Inv. Trust v. Nathaniel Greene Dev. Corp., 237 S.E.2d 107, 111 (Va. 1977); Finkel Outdoor Prods., Inc. v. Bell, 140 S.E.2d 695, 699 (Va. 1965)); 1 DAN B. DOBBS, LAW OF REMEDIES § 2.4(4), at 104 (2d ed.

4

1993) ("When laches does not amount to estoppel or waiver, it does not ordinarily bar legal claims, only equitable remedies."). But see Maksym v. Loesch, 937 F.2d 1237, 1247-48 (7th Cir. 1991) (noting that "[l]aches is an equitable doctrine but one increasingly applied in cases at law," although ultimately determining that laches could not be applied in a suit for purely legal damages). Further, when a complainant presents mixed claims--that is, legal and equitable--courts have held that laches may be raised as a defense to the equitable claims alone. Nilsen v. City of Moss Point, 674 F.2d 379, 388 (5th Cir. 1982); Crot v. Byrne, 646 F. Supp. 1245, 1253 (N.D. Ill. 1986).

Even if laches may not be asserted against claims for legal damages, the defense of equitable estoppel bars both legal and equitable claims. See Massachusetts Bonding & Ins. Co. v. Piedmont Serv. Station, Inc., 181 S.E. 397, 400 (Va. 1935). Estoppel is a theory similar to laches and acquiescence. See 1 DOBBS , supra, § 2.3(5), at 88-89 (noting that courts refer to the doctrines of estoppel, laches, waiver, and acquiescence loosely and interchangeably and that "[e]stoppel is closely related to and sometimes identical with laches"); 2 id. § 6.4(6), at 106; see also City of Portsmouth, 349 S.E.2d at 354.* The Supreme Court of Virginia has defined the doctrine of equitable estoppel as "the consequence worked by operation of law which

_____

*Federal Rule of Civil Procedure 8(c) requires affirmative defenses to be raised in responsive pleadings. However, when an affirmative defense is raised at the trial court in a manner that does not result in unfair surprise, technical failure to comply precisely with Rule 8(c) is not fatal. Dresser Indus. v. Pyrrhus AG, 936 F.2d 921, 928 (7th Cir. 1991); Allied Chem. Corp. v. Mackay, 695 F.2d 854, 855-56 (5th Cir. 1983). In this case, Flying J and CFJ's summary judgment motion raised the defense of acquiescence, a notion similar to estoppel. 1 D OBBS, supra, § 2.3(5), at 88. Although the appellees labeled the defense as acquiescence, the parties set forth facts establishing equitable estoppel. See J.A. at 41-63. Indeed, Elliott's interpreted the appellees' assertion of acquiescence as an equitable estoppel defense. See J.A. at 76. Thus, it is appropriate for the Court to rely on estoppel in affirming the district court's grant of summary judgment. Cf. Home Ins. Co. v. Matthews, 998 F.2d 305, 309 (5th Cir. 1993) (finding pleading that raised defense of estoppel sufficient to raise defense of waiver); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1275 (2d ed. 1990) (noting liberality with which courts construe pleadings under Federal Rules).

enjoins one whose action or inaction has induced reliance by another from benefiting from a change in his position at the expense of the other." Employers Commercial Union Ins. Co. v. Great Am. Ins. Co., 200 S.E.2d 560, 562 (Va. 1973). Thus, a party will be prevented by its own conduct from asserting a right that causes detriment to a party who justifiably relied on such conduct and acted accordingly. Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 413 S.E.2d 599, 603 (Va. 1992); Webb v. Webb, 431 S.E.2d 55, 61 (Va. Ct. App. 1993). Absent a showing of fraud or deception, the elements of equitable estoppel are (1) a representation, (2) reliance, (3) change of position, and (4) detriment. Princess Anne, 413 S.E.2d at 603 (citation omitted). "To establish equitable estoppel, it is not necessary to show actual fraud, but only that the person to be estopped has misled another to his prejudice, or that the innocent party acted in reliance upon the conduct or misstatement by the person to be estopped." Waynesboro Village, LLC v. BMC Properties, No. 970343, 1998 WL 24141, *4 (Va. Jan. 9, 1998) (quoting T... v. T..., 224 S.E.2d 148, 152 (Va. 1976)). The party who relies upon estoppel must prove each element by clear, precise, and unequivocal evidence. Princess Anne, 413 S.E.2d at 603. Intent to relinquish a known right is not an element of equitable estoppel. Employers Commercial Union, 200 S.E.2d at 562 (distinguishing equitable estoppel from waiver). Courts may presume that a party possessed knowledge of facts basic to the exercise of a right when the facts would cause a reasonably prudent person to pursue an inquiry and to acquire knowledge. Id.

In this case, Elliott's CEO Carroll Elliott overtly and publicly represented to Flying J that he was in favor of Flying J's plans to build a travel plaza directly across the street from an Elliott's Exxon station. J.A. at 42, 61-63. Although Mr. Elliott was aware that Flying J could sell gas more profitably than Elliott's, J.A. at 62 ("Speaking of pricing on the market: I have been faced with this pricing strategy on the east-side. . . . I am the only dealer-operated business on the exit. . . . All the rest of the businesses buy petroleum as a jobber or marketer. This gas is normally priced 6 to 15 cents cheaper than I can buy it. The truck stops and other jobbers, Amoco and Citgo, sell millions of gallons of petroleum at a much higher margin of profit than I do. However, I am still in business."), he actively encouraged Caroline County officials to approve Flying J's proposal. J.A. at 63 ("This new plaza

6

can only move my gross business up. . . . I can grow. . . . I think we should all get on [Flying J's] side and let this project exist to support the county tax base. . . . If [Flying J] does not come here, then it will be put at another exit close by and out of this county."). Flying J, believing that Elliott's acquiesced in its construction plans and acting with Elliott's encouragement, invested $9 million in building a travel plaza, while Mr. Elliott presumably watched the blocks being laid from across the street. J.A. at 42, 47. Elliott's belated demand that Flying J shut down its multi-million dollar travel plaza and pay damages, if granted, would greatly prejudice the appellees. Further, although Mr. Elliott knew that the travel plaza would compete with Elliott's retail outlets by selling petroleum products more profitably, J.A. at 62-63, a fact that would cause a reasonably prudent person to inquire how Flying J was able to compete so effectively, he refrained from investigation until after Elliott's began to lose money and after Flying J spent millions. Flying J and CFJ have proved these facts by clear and unequivocal evidence, and Elliott's cannot now be heard to complain about a competing business that it so actively solicited. Accordingly, the Court finds Elliott's claim for relief barred by the defenses of laches and equitable estoppel. The Court affirms the judgment of the district court.

AFFIRMED