**Robert M. LEE, Plaintiff–Appellant,**

v.

**Graceia VOYLES, et al., Defendants–Appellees.**

No. 88–3504.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1990.

Decided March 30, 1990.

Francis D. Morrissey, William Lynch Schaller, Baker & McKenzie, Chicago, Thomas F. Londrigan, Londrigan, Potter & Randle, R. Kurt Wilke, Carl O. Hoffee, Barber, Segatto, Hoffee & Hines, Springfield, for plaintiff-appellant.

Dan K. Webb, Winston & Strawn, Chicago, Wayne R. Golomb, Springfield, for defendants-appellees.

Before WOOD, Jr., CUDAHY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

King Leopold III of Belgium surrendered his army to Hitler on May 28, 1940, and was taken captive. The elected government of Belgium did not accept the decision and fled to England, condemning him. Paul Reynaud, the Premier of France, accused Leopold of belonging to Hitler's Fifth Column. Although these accusations were baseless (Leopold did not surrender until his army ran out of ammunition), the perception that the King gave up too quickly lingered, and he lived in Switzerland while his brother Charles served as regent. A plebiscite approved his restoration to the throne, but feelings ran so high in some parts of the country that Leopold abdicated in August 1950 in favor of his son Baudouin. Roger Keyes, *Outrageous For-*

*tune: The Tragedy of Leopold III of the Belgians 1901–1941* (1984); John Cudahy, *The Armies March, A Personal Report* 97–117 (1941).

Time passes slowly for exiled monarchs. Relieved of the burdens of office, Leopold returned to the simple pleasures of life, such as 200 mph automobiles. This case is about one of them, a custom-designed 375 Plus Pinin Farina Cabriolet built in 1954 and known the world around as the "King Leopold Ferrari". (Pinin Farina was the designer; a cabriolet is a convertible coupe.) This superpowered, 12–cylinder car (the "375 Plus" was Ferrari's racing engine at the time) is "one of the most beautiful and elegant open bodied Ferraris ever created". Alan Boe, *The King Leopold Ferrari*, 37 Cavallino 24, 27 (1987). After Leopold had no further use for the car, it passed into private hands. Wayne Golomb bought it in Belgium in 1969. It was in deplorable mechanical condition. Wayne had the car shipped to Illinois, where he, his brother Larry, his parents Genevieve and Raymond, and his girlfriend Graceia Voyles spent more than a decade restoring the car to its former luster.

Wayne valued the King Leopold Ferrari above his other Ferraris and was proud to exchange photographs of it for pictures of the prize possessions of other Ferrari fanciers. Among his pen pals was Robert M. Lee, a big game hunter and exotic car fancier extraordinaire. In early 1988 Lee owned 20 Ferraris, from a 1952 Inter Pinin Farina Cabriolet to a 1987 Testarossa. Lee also owned five Bentleys, four Rolls Royces, a 1927 Franklin, a 1939 Bugatti 57 Soutchik Cabriolet, a 1967 Corvette Roadster, a 1971 Maserati Ghibli Spyder, and 17 other cars, including a 1957 Ford Fairlane Retractable Convertible. One glimpse of a photograph of the King Leopold Ferrari persuaded Lee that he wanted that car too. In February 1985 Wayne said that it was not for sale. Later Lee asked Wayne how much it would take to buy the car. Wayne replied $275,000 (which he apparently thought so high no one would be interested). Lee counteroffered $175,000; Wayne said no, but Lee was on the hunt and never gives up 'til he bags his quarry.

On October 11, 1985, when Lee was in the Chicago area, he stopped by Raymond and Genevieve's house (where the car is kept) to see and take a drive in the King Leopold Ferrari. Lee did not mention the possibility of buying the car until Wayne drove him back to the airport. Lee offered first $200,000, then $210,000; Wayne said no. Lee called on the 12th to offer $225,000; Wayne said no. Lee called on October 15th and offered to split the difference; Wayne said no. Lee tried again on October 16, this time with an offer he thought Wayne could not refuse: $275,000. As Lee characterizes it, "I finally agreed to 275,000 dollars." Wayne, however, did not say "I accept". The parties debate just what he did say. Wayne says now that he said then that he would take the offer to his parents to see whether they approved. Although Lee does not attribute to Wayne an unequivocal "yes", or even a renewed offer to sell at any price, he insists that Wayne mentioned nothing about his parents' approval.

Lee flew to Chicago on Thursday, October 17, to pick up the keys. Wayne promised to meet him at the airport but didn't. (Wayne, an attorney, says that he was in conference with a client in Springfield, his home.) Wayne called Lee and told him to make out four checks (for Voyles and three of the Golombs, excluding Larry). Lee did so. Voyles endorsed hers over to Wayne's father. Wayne and Voyles visited Raymond and Genevieve in Michigan that weekend. According to Wayne, his parents could not bear to part with the King Leopold Ferrari. On Monday, October 21, Wayne sent Lee this letter:

As I said in our Thursday phone conversation, I did not want to do anything, or you to send any money until I spoke with my parents. Unfortunately I could not get with them until Sunday afternoon.

After talking with them, the car will not be sold. So that there is no misunderstanding, I am returning the checks I received Saturday by Federal Express this morning.

Lee turned from persuasion to litigation, filing this suit under the diversity jurisdiction against Voyles and the four Golombs to contend that Wayne broke his contract and should be made to turn over the car.

Voyles and the Golombs are citizens of Illinois; the complaint alleges that Lee is a citizen of New York. That satisfies the requirement of complete diversity, but Wayne insists that Lee spends so little time in New York that he could not possibly be its citizen. Lee's firm (Hunting World Inc.) has a New York address, but Lee spends much of his time on safari or in Montana. Lee's cars are stashed throughout the world—Nevada, Florida, California, Montana, Arizona, England, France, Germany, and Italy. Only one is in New York. The magistrate, who tried the case by consent under 28 U.S.C. § 636(c), denied the motion to dismiss for want of jurisdiction but made no findings, complicating our task.

Lee's deposition makes it clear that he is not a citizen of New York. He stays in the Beekman Tower Hotel when he visits the city. He does not vote in New York (or anywhere else) and disclaims any intention of returning to that state on a more enduring basis. But this is unimportant, for unless Lee is a citizen of Illinois or an expatriate, *Newman–Green, Inc. v. Alfonzo–Larrain,* —— U.S. ——, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), there is still jurisdiction. He has no ties to Illinois, and the defendants do not contend that his domicile is outside the United States. Asked where he lives, Lee answered "I live at 366 Ennis Lake Road, Ennis, Montana". Lee estimated that he spends three to fourteen days per month in Montana, five to seven days per month in New York, and the rest of the time can be found anywhere in the world. Lee is peripatetic, but still a citizen and domiciliary of the United States—and not of Illinois. Complete diversity is present.

Sometimes fascinating facts bring with them exciting legal issues. This is not such an occasion. After a bench trial, the magistrate found that a contract had never been formed. Wayne Golomb made an offer of $275,000, which Lee did not accept. Lee's counter-offer rejects the original offer, which expires and may not be "accepted" later. *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.,* 137 Ill.App.3d 550, 558–59, 92 Ill.Dec. 323, 330, 484 N.E.2d 1178, 1185 (1st Dist.1985). Lee made increasing bids, all of which Wayne rejected. Lee finally bid $275,000, but at the time he did so there was no offer on the table. And, the magistrate concluded, Wayne did not accept the bid of $275,000 but temporized, waiting for his parents' approval. Lee attacks this finding as clearly erroneous, but it is not. As the magistrate put it, unless the rest of the family had some role to play, why ask for four checks? The magistrate credited Wayne's testimony that he never unequivocally accepted the offer. Because Lee was not in a position to "accept" Wayne's initial offer of $275,000, a contract was not formed.

There is another way of getting to the same conclusion: the statute of frauds. Section 2–201(1) of the Uniform Commercial Code, which Illinois has adopted, Ill. Rev.Stat. ch. 26 ¶ 2–201(1), provides that a contract for the sale of goods worth more than $500 "is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought". Although Lee peppered Wayne with paper, including letters summarizing their "agreement", Wayne signed none of these. Not until the letter of October 21 did Wayne put pen to paper, and this letter denies that a contract has been made. Graceia Voyles endorsed her check, but Lee needs Wayne's signature, not hers. (Her signature was in any event consistent with Wayne's contention that he was making ready to perform should his parents agree.) Although later acknowledgment can take the place of a signed writing, see *DF Activities Corp. v. Brown,* 851 F.2d 920 (7th Cir.1988) (Illinois law), Wayne and his family have consistently denied that a bargain was struck. All agree that Wayne and Lee engaged in negotiations, and that the price was to be $275,000, but this is not equivalent to conceding that a deal had been concluded at that price. On this subject, the critical one,

the parties have been in disagreement since October 17, 1985.

So there was no contract, and at all events any agreement was not signed in writing by the person Lee seeks to bind. Those seeking a royal car for their own collections had best negotiate with all four Golombs next time.

AFFIRMED.