### TIBOR MACHINE PRODUCTS, INC., an Illinois Corporation, Plaintiff and Counter–Defendant,

v.

### FREUDENBERG–NOK GENERAL PARTNERSHIP, a general partnership, Defendant and Counter–Plaintiff.

#### No. 94 C 7635.

United States District Court, N.D. Illinois, Eastern Division.

March 24, 1997.

Addendum to Opinion May 27, 1997

---

Michael Alan Weinberg, Eric Neal Macey, Patrick A. Fleming, Joel Saul Schreier, Jennifer Lyn Friedes, Novack & Macey, Chicago, IL, for Plaintiff.

Robert P. Hurlbert, Louis Theros, Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, Richard A. Wilhelm, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for Defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

Before the court is the defendant's motion to dismiss the plaintiff's recoupment and breach of contract claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated in this opinion, the defendant's motion is denied in part and continued in part.

### BACKGROUND

The defendant and counter-plaintiff, Freudenberg–NOK General Partnership ("FNGP"), supplies component parts to the automotive industry. The plaintiff and counter-defendant, Tibor Machine Products, Inc. ("Tibor"), is an Illinois corporation that produces "machined" parts. In 1992, Nissan Motor Manufacturing Corporation ("Nissan") hired FNGP to supply Torsional Vibration Dampers ("TVDs") for Nissan's VG–30, Six Cylinder engine project. FNGP then contacted Tibor about a potential agreement under which Tibor would manufacture some of the elements of the TVDs. Within approximately two years, relations between Tibor and FNGP broke down. The events leading up to the collapse are the basis of the present controversy.

Neither the parties nor the subject matter of this dispute are unfamiliar to the court. In *Tibor Machine Products, Inc. v. Freudenberg–Nok General Partnership*, No. 94 C 7635, 1996 WL 99896 (N.D.Ill. Feb.29, 1996) ("*Tibor I* "), we granted Tibor's 12(b)(6) motion to dismiss FNGP's counterclaims for economic duress and fraudulent misrepresentation. We dismissed the first claim because Illinois law does not recognize a cause of action for damages for economic duress and because the claim did not satisfy the "illegality" element of Michigan law. *Id.* at *2–*3. We also dismissed FNGP's claim for fraudulent misrepresentation, but granted FNGP leave to file an amended claim alleging that Tibor's misrepresentations constituted "a scheme or device used to cheat FNGP." *Id.* at *5. In *Tibor Machine Products, Inc. v. Freudenberg–Nok General Partnership*, No. 94 C 7635, 1996 WL 535338 (N.D.Ill. Sept.19, 1996) ("*Tibor II* "), we denied Tibor's 12(b)(6) motion to dismiss FNGP's counterclaims for breach of contract, promissory estoppel, and fraudulent misrepresentation. We held that (1) FNGP had adequately alleged the existence of a contract and Tibor's acceptance of that contract, *id.* at *2–*3; (2) FNGP's breach of contract claim did not preclude its claim for promissory estoppel because "the terms of the alleged contract between the parties are not yet clear," *id.* at *4; (3) FNGP's amended claim for fraudulent misrepresentation adequately alleged that Tibor intended to defraud FNGP and that FNGP reasonably relied on Tibor's alleged concealments, *id.* at *5–*6; and (4) FNGP's amended claim for fraudulent misrepresentation met the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Id.* at *6. We also denied Tibor's motion to strike some of FNGP's claims for damages because FNGP adequately alleged that its payments to Tibor may have been compulsory. *Id.* at *7. In *Tibor Machine Products, Inc. v. Freudenberg–Nok General Partnership*, 942 F.Supp. 1165 (N.D.Ill.1996) ("*Tibor III* "), we granted in part and denied in part FNGP's 12(b)(6) motion to dismiss Tibor's claims for common law fraud, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, promissory estoppel, and recoupment. Specifically, we held that (1) Ti-bor adequately alleged that FNGP engaged in a scheme to defraud Tibor and that Tibor reasonably relied on FNGP's alleged promise of a five-year contract, *id.* at 1169–71; (2) Tibor stated a claim under the Consumer Fraud Act even though the complaint did not allege an injury to consumers, *id.* at 1171–73; and (3) Tibor's complaint did not preclude its claim for promissory estoppel because it was unclear whether an enforceable contract had been created and because the terms of the alleged contract were uncertain. *Id.* at 1173–75. We dismissed Tibor's recoupment claim, but granted Tibor leave to file an amended claim alleging the existence of a contractual agreement. *Id.* at 1175–76.

Our opinion today addresses FNGP's 12(b)(6) motion to dismiss Tibor's claim for breach of contract and Tibor's amended claim for recoupment. Because we must view them in the light most favorable to the nonmoving party, we draw the background facts from Tibor's complaint. Those facts are as follows. In 1992, Nissan hired FNGP to supply TVDs for the VG–30 project. The two main components of TVDs are "rings" and "hubs." FNGP asked Tibor to provide a price quotation for machining the rings and hubs necessary for the VG–30 project. FNGP indicated that if it accepted Tibor's quotation, it would purchase all of the required rings and hubs from Tibor. FNGP also indicated that the purchase agreement would mirror FNGP's contract with Nissan, which covered a five-year period. Tibor submitted a price quotation to FNGP on April 10, 1992. The quotation specified prices for quantities of parts ranging from 120,000 to 150,000 per year.

On or about June 11, 1992, FNGP advised Tibor that it had decided to hire Tibor as its long-term supplier for the VG–30 project. FNGP submitted to Tibor a "Supplemental Purchase Terms and Conditions" document (the "SPTCD") which set forth the material terms of the agreement. The SPTCD stated that Tibor would be FNGP's exclusive supplier of rings and hubs for five years. On June 22, 1992, Tibor executed and presented a revised quotation (the "1992 Quotation") to FNGP which incorporated the terms of April, 1992 proposal and the SPTCD. In a letter

dated June 23, 1992 (the "1992 Letter"), Tibor thanked FNGP for selecting Tibor as its supplier and proposed a number of modifications to the SPTCD. During the course of a telephone conversation, FNGP then indicated that the principal terms of the agreement had been established and that FNGP was considering the proposed modifications. On or about July 22 and July 23, 1992, FNGP submitted purchase orders (the "1992 POs") for Tibor to machine sample rings and hubs for the VG–30 project at agreed-upon prices.

At FNGP's request, in March and April of 1993 Tibor began machining larger quantities of sample rings and hubs. Tibor determined that the prices quoted to FNGP could not be maintained without a substantial investment in specialized equipment. According to the complaint, FNGP knew from the outset that such equipment would be necessary to machine the quantity of rings and hubs needed for the VG–30 project. Tibor solicited proposals for automated and computerized equipment known as the "Robotic Cell." The Robotic Cell was to be dedicated exclusively to the production of VG–30 rings and hubs over the next five years. During a meeting on May 17, 1993, Tibor and FNGP discussed Tibor's possible acquisition of the Robotic Cell. On July 1, 1993, FNGP called Tibor to confirm that Tibor had ordered the Robotic Cell on June 30, 1993.

At some time prior to July 1994, FNGP gained the capacity to do in-house machining of the rings and hubs required for the VG–30 project. As a result, FNGP began to divert the delivery of certain raw materials (or "castings") from Tibor to FNGP facilities. FNGP then threatened to cease further purchases of rings and hubs from Tibor unless Tibor agreed to a 30 percent reduction in prices. Because Tibor would not agree to the reduction, FNGP directed its castings supplier to cut off shipments to Tibor. Tibor was subsequently unable to machine the necessary amount of rings and hubs.

Tibor alleges that, taken together, the SPTCD, Tibor's 1992 Quotation, and Tibor's 1992 Letter provided the material terms of an agreement between the parties. Tibor asserts that FNGP accepted these terms through the telephone conversation and through the 1992 POs sent to Tibor for rings and hubs. Tibor also asserts that it accepted the alleged offer by commencing delivery of the rings and hubs in accordance with the terms of the POs. Tibor contends that it suffered damages in excess of $5 million as a consequence of FNGP's breach of the contract. Tibor further contends that but for the alleged five-year contract, it would not have incurred expenses in excess of $1 million (such as the costs associated with the design and purchase of the Robotic Cell). Tibor therefore seeks to recoup these expenditures.

## DISCUSSION

In deciding a motion to dismiss the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co.*, 87 F.3d 209, 211 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996); *Wilson v. Formigoni*, 42 F.3d 1060, 1062 (7th Cir.1994). Dismissal is properly granted " 'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Cushing v. City of Chicago*, 3 F.3d 1156, 1159 (7th Cir.1993) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)).

FNGP contends that the complaint should be dismissed because Tibor has not alleged the existence of a valid contract. FNGP argues that (1) the SPTCD was a "draft" agreement used solely for the purpose of negotiation; (2) the documents relied on by Tibor contain materially different terms and, in some respects, are mutually exclusive; and (3) the 1992 Quotation and POs were independent "offers" with no relation to the SPTCD. FNGP also argues that the alleged contract would be invalid under the Statute of Frauds. FNGP maintains that Tibor's amended recoupment claim should be dismissed for the additional reasons that (1) the expenses Tibor seeks to recoup were not contemplated by the parties at the time the alleged agreement was made, and (2) Tibor did not share an at-will agency relationship with FNGP. We hold that Tibor has adequately stated a claim for breach of contract

in Count V of the complaint. Because it is unclear whether an agency relationship is a necessary component of a claim for recoupment, we reserve judgement, for the moment, on the facial validity of Count VI.

## I. Count V: Breach of Contract

■ To prevail on a claim for breach of contract under Illinois law,[1] a plaintiff must establish "an offer and acceptance, consideration, definite and certain terms of the contract, plaintiff's performance of all required contractual conditions, the defendant's breach of the terms of the contract, and damages resulting from the breach." *Aardvark Art, Inc. v. Lehigh/Steck–Warlick, Inc.,* 284 Ill.App.3d 627, 220 Ill.Dec. 259, 263, 672 N.E.2d 1271, 1275 (1996) (citing *Mannion v. Stallings & Co., Inc.,* 204 Ill.App.3d 179, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1990)). These substantive elements are reflected in Illinois pleading requirements. *See OnTap Premium Quality Waters, Inc. v. Bank of N. Ill., N.A.,* 262 Ill.App.3d 254, 199 Ill.Dec. 586, 590, 634 N.E.2d 425, 429 (1994) (holding that a breach of contract claim must include allegations of "the existence of a contract, performance of all contractual conditions, facts of defendant's breach, and the existence of damages as a consequence thereof"); *Nuccio v. Chicago Commodities, Inc.,* 257 Ill.App.3d 437, 195 Ill.Dec. 670, 675, 628 N.E.2d 1134, 1139 (1993) (holding that a complaint based on breach of contract must include allegations signifying an offer, acceptance, and consideration); *see also Tibor II,* 1996 WL 535338, at *2 (citing additional Illinois cases).

■ Under the Federal Rules of Civil Procedure, a plaintiff must "allege facts that, if proven, would provide an adequate basis for each claim." *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988); *Ungaro v. Rosalco, Inc.,* 948 F.Supp. 783, 784 (N.D.Ill. 1996). Nonetheless, the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989); *Resolution Trust Corp. v. Fortunato,* No. 94 C 2090, 1994 WL 478616, at *1 (N.D.Ill. Sept.1, 1994).

Thus, for Tibor's breach of contract claim to survive a motion to dismiss under Rule 12(b)(6), Tibor "need only plead the bare essentials of offer, acceptance, consideration, performance by the plaintiff and breach by the defendant causing the loss." *Strathmore Co. v. National R.R. Passenger Corp.,* No. 92 C 3953, 1992 WL 280509, at *2 (N.D.Ill. Oct.5, 1992) (citing *Derson Group Ltd. v. Right Management Consultants, Inc.,* 683 F.Supp. 1224, 1230 (N.D.Ill.1988)); *see also Ohio Cas. Ins. Co. v. Bank One,* No. 95 C 6613, 1997 WL 30951, at *2 (N.D.Ill. Jan.22, 1997) (Grady, J.) (listing the necessary allegations for a breach of contract claim). It follows that, at the pleading stage, Tibor need only allege—rather than prove—the existence of a valid contract. *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.,* 844 F.Supp. 1271, 1273–74 (N.D.Ill.1994) (Grady, J.); *Holley v. Pansophic Sys., Inc.,* No. 90 C 7505, 1992 WL 137124, at *5 (N.D.Ill. June 12, 1992).

### A. The Alleged Contract

#### 1. The "Offer"

■ Under Illinois law, "[t]he test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.,* 58 F.3d 1227, 1229 (7th Cir.1995) (citations omitted). FNGP initially contends that the documents relied upon by Tibor cannot be interpreted as a "offer" because (1) the SPTCD was merely a draft agreement used for purposes of negotiation, and (2) the SPTCD and the 1992 quotation contain materially different terms. FNGP offers two reasons why the SPTCD must be viewed exclusively a "negotiating document" instead of a binding offer. First, FNGP argues that Tibor itself viewed the SPTCD as an instrument for negotiations. FNGP directs the court's attention to Tibor's 1992 letter, which uses terms such as "proposed" and "draft" while suggesting changes in the SPTCD's price provisions. FNGP also maintains that paragraph 28 of Tibor's complaint indicates that the SPTCD was the subject of ongoing negotiations more than

---

**1.** The parties agree that Illinois law governs the alleged contract.

one year after the agreement was allegedly consummated. Second, FNGP argues that the copy of the SPTCD attached to Tibor's complaint is not the document that was submitted to Tibor on June 11, 1992. FNGP asserts that the true version of the SPTCD had handwritten notations by one of its employees, Charles Pope, on each page; included in the notations were the word "Draft," Pope's initials, and the date of the proposal. FNGP then asserts that "draft" documents cannot create contractual obligations under Illinois law. However, we find that FNGP has not demonstrated that no set of facts exists under which Tibor's "bundle" of documents can be construed as an offer.

■ FNGP's argument that Tibor necessarily viewed the SPTCD as a preliminary document for negotiations is unpersuasive. Standing alone, Tibor's 1992 letter does not conclusively demonstrate that Tibor believed the sole purpose of the SPTCD was to facilitate negotiations. While the letter does refer to the SPTCD as "the FNGP Proposed 'Supplemental Purchase Terms and Conditions' draft," it also contains the following statement: "On behalf of TIBOR MACHINE PRODUCTS we thank you for choosing us as a machine supplier for your T.V.D. castings." This statement may or may not be sufficient to establish that the letter "patently reflects Tibor's understanding that an enforceable deal existed." Plaintiff's Response to Defendant's Motion to Dismiss Second Amended Count V, and Count VI, of Plaintiff's Fourth Amended Complaint ("Plaintiff's Response") at 7. Regardless, the statement at least makes the meaning of the letter ambiguous. Given this ambiguity, it would be inappropriate to hold, as a matter of law, that the 1992 letter demonstrates that Tibor viewed the SPTCD as a "negotiating document." FNGP also asserts that Tibor necessarily viewed the document as an instrument for negotiations because Tibor "objected to key pricing provisions" of the

SPTCD in its 1992 letter. Brief in Support of Defendant's Motion to Dismiss Second Amended Count V and Count VI of Plaintiff's Fourth Amended Complaint ("Defendant's Brief") at 3. However, whether the changes proposed in the 1992 letter were "major" or "minor" is clearly an issue of fact, not an issue pertaining to the facial validity of the complaint. Additionally, the complaint alleges only that the letter furnishes some of the terms of the contract, not that the letter constituted Tibor's *acceptance* of the agreement. While the fact that Tibor proposed "major" changes might tend to prove that Tibor never consented to the terms of the SPTCD, it is not obvious how this fact would undermine Tibor's claim that a contract was formed through the combination of several documents.

■ FNGP's reference to paragraph 28 of the plaintiff's complaint raises an intriguing procedural issue: whether, when evaluating a motion to dismiss one of the plaintiff's claims, the court should consider potentially contradictory allegations that have not been incorporated into the claim sought to be dismissed. Paragraph 28, which is incorporated into Counts I, II, III, and IV, states that on August 12, 1993, FNGP falsely represented to Tibor that FNGP was working to finalize a written agreement.[2] FNGP contends that this allegation demonstrates that the SPTCD was never executed and was the subject of ongoing negotiations. Tibor argues that paragraph 28 cannot be used to support FNGP's motion to dismiss because Counts V and VI, which are expressly pled in the alternative to Counts I–IV, do not incorporate paragraph 28 by reference. FNGP responds that the allegation in paragraph 28 does not support an element of any claim inconsistent Counts V and VI, and that paragraph 28 "is merely a background factual admission which helps defeat Tibor's contract claim." FNGP's Reply Brief in Support of Its Motion to Dismiss Tibor's Second

---

**2.** Paragraph 28 states in full:

On or about August 12, 1993, at a meeting at Tibor's facility in Chicago Ridge, Illinois, [FNGP] falsely represented to [Tibor] that FNGP would work to finalize the parties' written agreement and to consider including a provision that would assure Tibor of large enough orders to allow

Tibor to recover its investment costs. This representation was false in the FNGP had no intention of finalizing any written agreement with Tibor and that FNGP had no intention of assisting Tibor in recouping its investment.

Plaintiff's Fourth Amended Complaint ¶ 28.

Amended Counts V & VI ("Defendant's Reply") at 6. Neither the Federal Rules of Civil Procedure nor judicial opinions provide clear guidance on this issue. On the one hand, under Rule 8(e)(2), a litigant is permitted to state "as many separate claims or defenses as the party has regardless of consistency." [3] *See also* Fed. R. Civ. P. 8(a) (permitting a party to demand "[r]elief in the alternative or of several different types"). On the other hand, it is well settled that courts are not required to disregard facts set forth in the complaint that undermine the plaintiff's claim. *City Nat'l Bank v. Checkers, Simon & Rosner,* 32 F.3d 277, 281 (7th Cir.1994) (citing *Scott v. O'Grady,* 975 F.2d 366, 368 (7th Cir.1992)); *Conrad v. City of Chicago,* 954 F.Supp. 180, 181–82 (N.D.Ill. 1997); *Nyberg v. Puisis,* No. 93 C 6602, 1996 WL 754107, at *2 (N.D.Ill.Dec.31, 1996).

■ For two reasons, we find that each count of Tibor's complaint should be evaluated independently, and that Tibor's contract claims should not be dismissed based on the unincorporated allegations of paragraph 28. First, to hold otherwise would be contrary to the spirit (if not the letter) of the alternative pleadings rule. In the early stages of litigation, a plaintiff is permitted both to rely on alternative theories of recovery and to incorporate inconsistent facts in separate counts. *See Brewer v. Monsanto Corp.,* 644 F.Supp. 1267, 1270 (M.D.Tenn.1986) (commenting that adoption by reference under Rule 10(c) can lead to "internal inconsistency" in a complaint but that such inconsistency "is not fatal" under Rule 8(e)(2)); *cf. Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 61–62 (1st Cir.1992) (affirming the district court's decision to treat an inconsistent allegation as an admission because (1) the allegation was not made in the context of an alternative pleading, and (2) the plaintiff expressly incorporated the allegation into the count sought to be dismissed). It is often not until discovery that a plaintiff is able to determine which of his claims is sustainable, or if additional facts exist which will allow him to pursue multiple claims without contradiction. *Perlman v. Zell,* 938 F.Supp. 1327, 1338 (N.D.Ill.1996). While Tibor admittedly will not be able to prevail on all of the claims it has asserted, this hardly distinguishes the case from other contract disputes. *See, e.g., Ohio Cas. Ins. Co. v. Bank One,* No. 95 C 6613, 1996 WL 507292, at *9 n. 16 (N.D.Ill. Sept.5, 1996) (Grady, J.) (allowing a plaintiff to plead both unjust enrichment and breach of contract); *McIntosh v. Magna Sys., Inc.,* 539 F.Supp. 1185, 1190–91 (N.D.Ill.1982) (allowing a plaintiff to plead both quantum meruit and breach of contract); *see also International Cargo & Sur. Ins. Co. v. United States,* No. 91 C 5988, 1992 WL 168954, at *2 (N.D.Ill. July 15, 1992) (refusing to dismiss the plaintiff's unjust enrichment and breach of contract claims but noting that the court "will closely examine any future motion for summary judgment and at that time eliminate any inconsistent claim"). Moreover, FNGP's suggestion that the court should permit Tibor to plead inconsistent facts only if those facts are "elements" of alternative claims [4] raises some thorny procedural issues of its own. Although in some cases it may be readily apparent which facts constitute elements of inconsistent claims, in other instances it will be unclear which facts are "essential." Lacking any criteria to determine the relative importance of particular facts alleged in the complaint, we are reluctant to set a precedent requiring such an analysis. Second, additional safeguards in the Federal Rules prevent Tibor and other litigants from using the

---

**3.** Rule 8(e)(2) provides:

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11.

Fed.R.Civ.P. 8(e)(2).

**4.** *See* Defendant's Reply at 6 ("Tibor's allegation of on-going negotiations does not support an element of promissory estoppel ... and thus would *not* constitute an inconsistent fact supporting an alternative claim.").

alternative pleadings rule to artificially manufacture claims. For example, a plaintiff stating alternative claims remains subject to the obligations set forth in Rule 11. Hence, a plaintiff may only assert contradictory statements of fact when he "legitimately is in doubt about the fact in question." *Great Lakes Higher Educ. Corp. v. Austin Bank,* 837 F.Supp. 892, 894 (N.D.Ill.1993); *see also* Fed.R.Civ.P. 11(b)(3) (stating that an attorney submitting a pleading certifies that the allegations and other factual contentions are likely to have evidentiary support). Neither Rule 8(e)(2) nor Rule 11 permits a plaintiff to intentionally ignore relevant evidence in order to assert unfounded claims. *Great Lakes,* 837 F.Supp. at 895. Since nothing submitted to the court to date indicates that Tibor's selective incorporation of paragraph 28 exceeds the limits of Rule 11, we conclude that the allegations in Count V and VI should be judged on their own terms.

■ FNGP's other argument—that the true version of the SPTCD was marked "draft" and thus cannot constitute an offer—raises another interesting procedural issue. Under Federal Rule of Civil Procedure 10(c),[5] a defendant may attach documents to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993). Thus, although a plaintiff is not obligated to attach pertinent documents to his complaint, a defendant may introduce the documents if the plaintiff chooses not to do so. *Id.* In this case, it appears that

FNGP is not simply attempting to round out the pleadings by submitting an unattached document that is relevant to Tibor's claim. Rather, the thrust of FNGP's argument seems to be that the copy of the SPTCD appended to Tibor's complaint is not the same document FNGP presented to Tibor on June 11, 1992. This is presumably an issue of fact, and normally we would be hesitant to resolve it on a motion to dismiss.

■ However, whether or not the SPTCD attached to Tibor's complaint is authentic can be determined without relying on FNGP's factual representations. FNGP cannot, of course, challenge the sufficiency of Tibor's claims simply by attaching documents that contain factual assertions contrary to those in the complaint. *See Tibor II,* 1996 WL 535338, at *2 n. 2 (noting that consideration of a motion to dismiss is limited to the pleadings and that the complaint cannot be amended by the parties' briefs). Nevertheless, as discussed above, the court generally is not required to ignore facts in the complaint that undermine the plaintiff's claim. And, indeed, other documents attached to the complaint by the *plaintiff* reveal that Tibor has not submitted a copy of the SPTCD to which Count V refers. The parties agree that the "real" SPTCD was proffered by FNGP to Tibor on or about June 11, 1992. On or about June 23, 1992, Tibor sent a letter to FNGP recommending a number of changes to the SPTCD.[6] Inexplicably, however, the copy of the SPTCD attached to the complaint incorporates some of the changes suggested in the June 23 letter.[7] To state

5. Rule 10(c) reads in full: "Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed.R.Civ.P. 10(c).

6. Tibor has appended the 1992 letter to the complaint as "Exhibit D."

7. The changes suggested by the letter that have been incorporated into Tibor's version of the SPTCD include the following:
SECTION 2 —*Prices and Price Adjustments* ...
 F. ADD "All raw materials and finished goods to be F.O.B. TIBOR MACHINE PRODUCTS, Chicago Ridge or Bedford Park, IL...."

SECTION 3 —*Process Control* ...
 D. Seller agrees to maintain material certification files for raw materials as required by the buyer....
SECTION 6 —*Inventory*
 Does not apply—please remove.
SECTION 7 —*Price Schedules*
 A. ADD "Prices do not include balancing or painting."...
SECTION 10 —*Scrap*
 During 1st year of production, 2% accumulative allowance for machining scrap. 1% accumulative allowance for remaining years. Foundry scrap exceeding the 2% and 1% annual allowances will be charged back to FNGP according to the amount of machining completed at point of discovery. Any machine scrap generated by TIBOR which exceeds the 2% and 1% will be credited to FNGP.

the obvious, the document the parties exchanged on June 11 could not possibly have incorporated changes that were not proposed until almost two weeks later. As a consequence, Tibor cannot be said to have attached a copy of the SPTCD upon which its breach of contract claim is based. The court will therefore consider the copy of the SPTCD attached to FNGP's brief without converting the motion into one for summary judgment.

All of this brings us to FNGP's argument that a "draft" notation prevents a document from being construed as an offer. FNGP asserts that *Feldman v. Allegheny Int'l, Inc.,* 850 F.2d 1217 (7th Cir.1988), requires the court to dismiss breach of contract claims based on "draft" documents, so a brief discussion of that decision is in order. In January 1982, the parties in *Feldman* signed a "letter of intent" through which they committed themselves to negotiate the purchase of a group of food-related companies. In June 1982, the parties met to discuss their most recent draft of a sale agreement. *Id.* at 1219. At the close of the meeting, the defendant's attorney stated that he believed the parties had a deal. Soon after, however, the discussions reached an impasse and the defendant eventually sold the companies to another buyer. *Id.* at 1220. Feldman sued, arguing that the letter of intent obligated the defendant to sign the June 1982 draft agreement. At the close of Feldman's presentation of evidence, the trial judge directed a verdict in favor of the defendant. The Seventh Circuit affirmed, and made the following observation:

> Even if we were persuaded that a duty of good faith obligated [the defendant] to sign an agreement eventually, we could not seriously entertain the notion that it could be forced to sign the June [ ] agreement as that agreement was fatally incomplete: on its face, the document not only leaves the purchase price blank, but also leaves blank the portion of the payment to be in cash and the amount to be carried as debt.... Having neither set a price, nor a mechanism to calculate a price, the draft cannot

constitute a contract; there has been no meeting of the minds.

*Id.* at 1223–24 (citations omitted).

FNGP's assertions notwithstanding, *Feldman* does not require us to dismiss Count V of Tibor's complaint. First, the court in *Feldman* held that the draft agreement could not be construed as an enforceable contract because it omitted critical terms. The court did not, however, establish as a matter of law that a document marked "draft" can never give rise to contractual obligations. Because the possibility still remains that Tibor may be able to prove some set of facts that could entitle it to legal relief, a 12(b)(6) disposition of Tibor's claims based exclusively on the "draft" notation is unwarranted. Second, FNGP has not demonstrated that essential contract terms are missing from Tibor's amalgamation of the SPTCD, the 1992 quotation, and the 1992 letter. In fact, while Tibor acknowledges that the SPTCD did not specify a price, it also alleges that the 1992 quotation filled in the gap. *See* Plaintiff's Response at 10 ("The [SPTCD] contained no 'price' provision, but both Tibor's 1992 Quotation and FNGP's POs reflected identical pricing, *i.e.,* $1.82 per ring and $2.48 per hub.").

FNGP also stresses the fact that Tibor has not cited any Illinois cases holding that "draft" documents can constitute offers. Defendant's Reply at 7; *see also* Plaintiff's Response at 5 (citing *In re Windsor Plumbing Supply Co.* 170 B.R. 503, 523 (E.D.N.Y.1994) (Holland, Bankr.J.) for the proposition that documents marked "draft" can create enforceable contracts). FNGP's observation is accurate, but not particularly relevant given the procedural posture of the case. On a motion to dismiss, it is the *defendant's* responsibility to show that, assuming the truth of the allegations, the plaintiff is not entitled to any form of legal relief. Moreover, while there are cases in which claims based on "draft" contracts have ultimately proven unsuccessful, *see, e.g., Lee v. John Labatt Ltd.,* No. 91 C 8352, 1992 WL 6697, at *1–*2

Second Amended Count V, and Count VI, to Plaintiff's Fourth Amended Complaint ("Second Amended Counts V & VI"), Exhibits B, D.

(N.D.Ill. Jan.15, 1992) (holding that it was unlikely that a draft agreement constituted a binding contract because (1) the draft's failure to include important terms and the signature of one of the parties prevented it from being an "offer;" and (2) the plaintiff's "acceptance" letter was insufficient because it did not address "[the] purchase price, the identity of the proposed buyer, or the precise assets to be acquired"), the court is not aware of any decision dismissing a complaint under Rule 12(b)(6) because of the "draft" notation on of certain documents. We therefore decline FNGP's invitation to dismiss the complaint simply because the word "draft" appears on the SPTCD.

 FNGP further contends that the 1992 quotation cannot be combined with the SPTCD to create a contractual agreement because the quotation was itself an independent offer for a separate contract. In addition, FNGP highlights the following differences between the 1992 quotation and the SPTCD: (1) the SPTCD envisioned a requirements contract, whereas the quotation specified yearly production volumes at particular prices; and (2) the SPTCD did not indicate the cost for tooling, whereas the quotation specified a price of $35,000.00. Defendant's Brief at 4–7. We find, however, that any inconsistencies between the 1992 quotation and the SPTCD are not so facially apparent that Counts V and VI must be dismissed as a matter of law. In response to the foregoing, Tibor makes the following points: (1) the quotation was mailed to FNGP within one day of Tibor's letter, which specifically referred to the SPTCD; (2) the quotation reflected the quantities of parts the parties estimated FNGP would need to meet its requirements under the SPTCD; and (3) the quotation was intended to fill the price "gap" in the SPTCD by providing per-unit prices for rings and hubs. Plaintiff's Response at 10. These arguments demonstrate

that it is at least plausible that the 1992 quotation was part of a "bundle" of documents that collectively established the provisions of a contract. Furthermore, FNGP has cited no law that would preclude the existence of an offer based on the combined terms of the quotation and the SPTCD. While the general rule is that price quotations are merely invitations to submit offers, *Outboard Marine Corp. v. Babcock Indus., Inc.*, No. 91 C 7247, 1994 WL 468596, at *4 (N.D.Ill. Aug.26, 1994), it is not impossible for a price quotation to serve as an offer. *See Rush–Presbyterian St. Luke's Med. Ctr. v. Gould, Inc.*, No. 93 C 1661, 1993 WL 376163, at *2 (N.D.Ill. Sept.22, 1993) (noting that whether a price quotation is an offer "is a question of fact that depends on the parties' acts, their expressed intent, and the circumstances surrounding the transaction"); *McCarty v. Verson Allsteel Press Co.*, 89 Ill.App.3d 498, 44 Ill.Dec. 570, 576, 411 N.E.2d 936, 942 (1980) (observing that a price quotation, if sufficiently detailed, may constitute an offer). Dismissal of Tibor's claims based on potential inconsistencies between the 1992 quotation and the SPTCD would, therefore, be premature.

### 2. "Acceptance"

Section 2–206(1) of Uniform Commercial Code states that, unless otherwise unambiguously indicated, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." 810 ILCS 5/2–206(1)(a) (1993). FNGP challenges Tibor's allegation that FNGP accepted the terms of the putative contract through the 1992 POs.[8] First, FNGP avers that it could not have accepted the alleged offer through the POs because those orders were independent offers with no relation to the SPTCD. For example, FNGP notes that the "Terms and

---

**8.** In addition to its arguments based on the POs, FNGP also contends that Tibor could not have accepted the provisions of the SPTCD through the 1992 quotation. However, while the complaint contains one passage stating that Tibor "confirmed" the terms of the SPTCD through the quotation, see Second Amended Counts V & VI ¶ 59, it does not appear that Tibor has alleged that the quotation constituted its "acceptance" of

the SPTCD. *See id.* ¶¶ 63–64 (asserting that FNGP accepted the alleged contract through oral assurances and purchase orders and that Tibor accepted the agreement by commencing delivery of the rings and hubs); Plaintiff's Response at 2–3 (same). Although we will accordingly limit our "acceptance" inquiry to the purchase orders and FNGP's oral assurances, much of our analysis will be applicable to the 1992 quotation as well.

Conditions" provisions of the orders expressly characterize the POs as "offers" that could be accepted by signature or performance.[9] Second, FNGP contends that there are material differences between the POs and the SPTCD, including the following: (1) the POs were for tooling and certain quantities of sample rings and hubs, whereas the SPTCD represented a requirements contract for production quality rings and hubs; (2) the POs set the price for tooling at $17,500.00, whereas the SPTCD contained no price provision for the rings and hubs; and (3) the POs stated that the rings and hubs were to be produced by November 1, 1992, whereas the SPTCD pertained a multi-year agreement commencing in August 1993.

■ FNGP's argument that the purchase orders were necessarily "offers" and not "acceptances" of a separate offer is unavailing. It is true that purchase orders usually "are offers to buy and are construed as inviting acceptance." *Echo, Inc. v. The Whitson Co.,* No. 93 C 4349, 1994 WL 395004, at *1 (N.D.Ill. July 26, 1994); *see also Beard Implement Co. v. Krusa,* 208 Ill.App.3d 953, 153 Ill.Dec. 387, 390, 567 N.E.2d 345, 348 (1991) (holding that a purchase order for farm equipment "constitute[d] an offer made by defendant to plaintiff"). However, this is simply rule of thumb, not ironclad doctrine. Under certain circumstances, a purchase order can signify a party's acceptance of a previous offer. *See Michigan Ave. Nat'l Bank v. Evans, Inc.,* 176 Ill.App.3d 1047, 126 Ill.Dec. 245, 250, 531 N.E.2d 872, 877 (1988) (finding that purchase orders for furs probably constituted acceptances of an external contract rather than independent offers); *see also Taft–Peirce Mfg. Co. v. Seagate Tech., Inc.,* 789 F.Supp. 1220 (D.R.I.1992) (holding that the defendant, through a purchase or-

der, accepted the plaintiff's offer to sell a specialized machine).

■ Of course, that a purchase order *can* constitute an acceptance of an offer does not mean that FNGP *did,* in fact, accede to the terms of the alleged offer by issuing the 1992 POs. In this case, it appears that FNGP has compiled an impressive list of discrepancies between its POs and the SPTCD. Nonetheless, we conclude that these discrepancies are insufficient to justify dismissal at this juncture. Three points bear emphasis. First, in addition to alleging that FNGP accepted the "offer" through the POs, Tibor has also alleged that FNGP orally accepted the combined terms of the SPTCD, the 1992 quotation, and the 1992 letter. *See* Second Amended Counts V & VI ¶¶ 60, 63 (alleging that FNGP assured Tibor in a telephone call "that the material terms of the parties' agreement were established"). The U.C.C. recognizes "any manner of expression of agreement, oral, written or otherwise." 810 ILCS 5/2–204(1) cmt. (1993).[10] Thus, it is not beyond the realm of possibility that FNGP's oral assurances, by themselves, sufficiently demonstrated FNGP's acceptance of the SPTCD. Although FNGP disputes Tibor's assertion that FNGP orally assented to the terms of the SPTCD, on a motion to dismiss the court must assume the truth of Tibor's allegations and draw all reasonable inferences in Tibor's favor.

Second, the Uniform Commercial Code "tolerates a good deal of incompleteness and even contradiction in offer and acceptance." *Architectural Metal,* 58 F.3d at 1230. Under § 2–207(1), an acceptance which contains terms different from those in the offer does not convert the acceptance into a counter-offer or otherwise make it ineffective as an

---

9. The "Terms and Conditions," which include sections entitled "OFFER" and "ACCEPTANCE," are listed on the backside of the POs. Although Tibor has not attached copies of the reverse side of the POs to the complaint, the orders are clearly central to Tibor's claims. *See Venture,* 987 F.2d at 431. We are therefore at liberty to consider the copies of the orders enclosed with FNGP's brief without converting the motion into one for summary judgment.

10. Section 2–204(1) of the U.C.C. reads: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 810 ILCS 5/2–204; *see also ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1452 (7th Cir.1996) (commenting that while "a contract can be, and often is, formed simply by paying the price and walking out of the store, the U.C.C. permits contracts to be formed in other ways").

acceptance. 810 ILCS 5/2–207(1) (1993);[11] *see generally Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1178 (7th Cir.1994) (reasoning that Illinois courts would likely adopt the majority view that under § 2–207 "the discrepant terms fall out and are replaced by a suitable U.C.C. gap-filler"). The Code also provides that even if the documents exchanged by the parties do not create a binding agreement, the parties' conduct may be sufficient to establish a contract. 810 ILCS 5/2–207(3) (1993);[12] *see also Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.*, 635 F.Supp. 1281, 1285 (N.D.Ill.1986) (noting that the parties' conduct can create a contract even though the writings of the parties do not otherwise establish one); *Gord Indus. Plastics, Inc. v. Aubrey Mfg., Inc.*, 103 Ill.App.3d 380, 59 Ill.Dec. 160, 164, 431 N.E.2d 445, 449 (1982) (same). Admittedly, the situation here is not a typical "battle of the forms" scenario, and the contract alleged by Tibor pushes the envelope even under the liberal provisions of the U.C.C. But the presumption is clearly against dismissal at the pleading stage, and we are unwilling to say that *no* set of facts could exist under which the POs could have functioned as acceptances of the alleged offer. For example, Tibor argues in its brief that the July 1992 POs for sample parts were merely "starters" in a series of orders for rings and hubs, *see* Plaintiff's Response at 10, and we cannot reject that claim out-of-hand before the factual record has been developed. Additionally, it is undisputed that Tibor has adequately alleged that it accepted the terms of the "offer" by delivering the rings and hubs. Since FNGP's receipt of these parts (or other conduct) may have indicated that FNGP assented to the terms of the SPTCD, the possibility remains that a contract could have been formed under § 2–207(3).

Third, we note that many of these themes were recently discussed in *Architectural Metal*, a breach of contract case in which the Seventh Circuit reversed a district court's entry of summary judgment for the defendant. The Seventh Circuit's comments are worth quoting at some length:

> Equally premature is the [district] judge's conclusion that if the price quotations were offers, [the plaintiff] did not accept them because its acceptance, which the judge deemed to be the purchase order of April 28, contained discrepant terms.... [The defendant's] brief contains an imposing list of discrepancies, which it describes as "radical," but admits that there is not a shred of evidence that they were potential dealbusters.... The Uniform Commercial Code, moreover, does not make even "radical" differences between offer and acceptance a ground for concluding there is no contract. If there is an offer and an acceptance, then however discrepant (within reason) their terms are, there is a contract, and the question is merely *what* the terms are.... Nor is it even clear that the purchase order here, with its discrepant terms, *was* the acceptance. The acceptance may have been oral.

58 F.3d at 1230 (citations omitted). With this commentary in mind, we hold that Tibor has adequately alleged the requisites of a contract.

## B. The Statute of Frauds

Under § 2–201(1) of the Uniform Commercial Code, an agreement for the sale of goods for $500.00 or more is not enforceable without a writing indicating that a contract between the parties has been made. 810 ILCS 5/2–201(1) (1993);[13] *see also A–Abart Elec.*

---

**11.** Section 2–207(1) provides:

A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
810 ILCS 5/2–207(1).

**12.** Section 2–207(3) reads as follows:

Conduct by both parties which recognizes the existence of a contact is sufficient to establish a

contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.
810 ILCS 5/2–207(3).

**13.** Section 2–201(1) provides:

Except as otherwise provided in this Section a contract for the sale of goods for the price of

*Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1403 (7th Cir.1992) (finding that an unsigned purchase order was insufficient to render enforceable an oral agreement for the sale of ceiling fans); *Lee v. Voyles*, 898 F.2d 76, 78–79 (7th Cir.1990) (holding that an oral contract for the sale of an automobile was unenforceable because the defendant never signed letters summarizing the alleged agreement). The writing or memorandum must satisfy three criteria: "First, it must evidence a contract for the sale of goods; second, it must be 'signed', a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity." 810 ILCS 5/2–201(1) cmt.; *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1154 (7th Cir.1989).

FNGP contends that the alleged contract is invalid under the Statute of Frauds for two reasons. First, FNGP argues that it did not authenticate the requirements contract contemplated by the SPTCD. FNGP maintains that neither the initials accompanying the "draft" notation nor the mere mention of the parties in the SPTCD constitutes a "signature." Second, FNGP argues that the 1992 quotation and the 1992 POs—documents which were conceivably "signed" by FNGP— do not contain statements betokening a requirements contract. According to FNGP, the quotation "gives no indication that the quantity mentioned on the face of the quote references FNGP's requirements." Defendant's Brief at 9. FNGP also avers that the POs fail to provide the needed quantity term because the orders were only for several hundred sample rings and hubs.

■ We need not resolve these issues, however, because the alleged contract appears to be saved by a statutory exception to § 2–201(1). Although requirements contracts are not generally exempt from the Statute of Frauds, *see Medline Indus., Inc. v. Keili Int'l, Inc.*, No. 89 C 4822, 1992 WL 133012, at *5–*6 (N.D.Ill. May 29, 1992) (stating, for example, that "[l]ike any other sales contract, a requirements contract must contain a quantity term"); *Ray Dancer, Inc. v. DMC Corp.*, 175 Ill.App.3d 997, 125 Ill. Dec. 447, 452, 530 N.E.2d 605, 610 (1988) (same, citing *Eastern Dental Corp. v. Isaac Masel Co.*, 502 F.Supp. 1354, 1364 (E.D.Pa. 1980)), the U.C.C. provides that a contract that would otherwise be invalid under § 2–201(1) is enforceable if (1) the goods are specially manufactured for the buyer and (2) the seller has made a "substantial beginning" in procuring the goods. 810 ILCS 5/2–201(3) (1993); [14] *see also GSI Distribs., Inc. v. Carson, Pirie, Scott & Co.*, No. 85 C 8076, 1986 WL 6235, at *3 (N.D.Ill. May 27, 1986) (refusing to dismiss a breach of contract claim under the Statute of Frauds because the plaintiff had made a substantial commitment to procure specialized silverware sets for the defendant). Tibor argues that the rings and hubs it machined for Nissan's VG–30, Six Cylinder engine project were not suitable for sale to others in the ordinary course of business, and that Tibor had taken significant steps toward the manufacture of the parts before FNGP allegedly breached the contract. FNGP has made no attempt to refute these arguments. We therefore deny FNGP's request to dismiss the complaint based on § 2–201(1).

## II. Count VI: Recoupment

■ The doctrine of recoupment is designed to remedy the inequity that arises when a contractor, after requiring the other party to make sizeable investments, unjustly terminates the agreement and leaves the other party with substantial unrecovered expen-

---

$500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
810 ILCS 5/2–201(1).

**14.** The relevant portion of § 2–201(3) states:

A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable ... if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement....
810 ILCS 5/2–201(3)(a).

ditures. *Cox v. Doctor's Assocs., Inc.*, 245 Ill.App.3d 186, 184 Ill.Dec. 714, 724, 613 N.E.2d 1306, 1316 (1993). Thus, when a contractor terminates an agreement without just cause, the terminated party can, under certain circumstances, recoup investments made in furtherance of the contract. *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, 913 F.Supp. 1088, 1142 (N.D.Ill.1995).

FNGP contends that Tibor's recoupment claim must fail as a matter of law for two reasons. First, FNGP argues that a party may only recoup expenses that were "within the reasonable contemplation of the parties at the time the contract was entered into." Defendant's Brief at 10. According to FNGP, both Tibor and FNGP assumed that tooling purchased via the 1992 POs would be sufficient to produce the rings and hubs under the alleged contract.[15] FNGP further asserts that the SPTCD and the 1992 quotation make no mention of $1 million in capital outlays. Second, FNGP argues that a claim for recoupment is available only when a party to an at-will agency relationship has been terminated without cause and has made investments at the behest of the other party to the contract. FNGP then notes that Tibor has not alleged the existence of an agency relationship.

■ FNGP's initial argument is unpersuasive. First, although the case law on recoupment is concededly sparse, *see Cox*, 184 Ill.Dec. at 724, 613 N.E.2d at 1316 (lamenting "the lack of Illinois authority on recoupment"), no opinion cited by FNGP demonstrates that a party asserting a recoupment claim can only recover "start up" expenses. The *Nichols* decision—the sole case cited by FNGP for this proposition—certainly contains no such language. After commenting that the doctrine of recoupment applies when a contract is terminated before one party has had an opportunity to recover its losses, the court in *Nichols* held that the plaintiff's claim failed because there was no evidence that the defendant had "required" the investments at issue. 913 F.Supp. at 1142–43. At no time did the court state that

Illinois law requires allegations of "expenses within the reasonable contemplation of the parties at the onset of the [agreement]." Defendant's Brief at 10, 12. Second, while some recoupment cases have indeed addressed the issue of "start up" costs, *see, e.g., Skinner v. Shirley of Hollywood*, 723 F.Supp. 50, 55 (N.D.Ill.1989) (granting a motion to dismiss because the plaintiff had over ten years to recoup its initial expenses), a requirement that an aggrieved party is entitled to recover *only* those investments made at the onset of the relationship would make little sense. When the terminated party incurred expenses in furtherance of the contract is, by itself, neither here nor there; the critical question is whether or not the aggrieved party had a sufficient opportunity to recoup any investments made at the request of the other party. Here, the complaint alleges that (1) Tibor relied on FNGP's representations and promises when it decided to purchase the Robotic Cell, Second Amended Counts V & VI ¶¶ 81–82; (2) FNGP called Tibor to confirm that Tibor had purchased the Robotic Cell, *id.* ¶ 70; and (3) FNGP wrongfully terminated the contract before Tibor could recoup its expenditures related to the Robotic Cell. *Id.* ¶ 83. These allegations appear to be sufficient to state a claim for recoupment.

Our conclusion that Tibor has adequately alleged a claim for recoupment is, however, a qualified one. Upon further reflection, it is apparent that FNGP's second argument—that a claim for recoupment is available only in the context of an agency relationship—deserves more attention than we gave it in our previous opinion. In *Tibor III*, we stated that we doubted that an agency relationship was a condition precedent to a claim for recoupment. 942 F.Supp. at 1175. For two reasons, we are prepared to revisit the issue. First, in *Tibor III* we attached some significance to the fact that Tibor was not attempting to assert a breach of contract claim under the theory of recoupment. *Id.* Given our holding that Tibor has sufficiently stated a claim for breach of contract, our earlier

---

**15.** In support of this argument, FNGP legitimately refers to paragraphs 58–63 of Counts V and VI and two of the exhibits attached to those Counts. However, FNGP also cites paragraphs 18 and 21 of the complaint, which are not specifically in-

corporated into Counts V and VI. For the same reasons that we excluded paragraph 28 in our review of Tibor's breach of contract claim, we will not consider paragraphs 18 and 21 in our analysis of Tibor's recoupment claim.

statement may no longer be accurate. If, for example, Tibor were to prevail on its breach of contract claim, it is unclear whether Tibor would be entitled to recover its expenses in connection with the Robotic Cell. If Tibor's expenditures would be recoverable as normal contract damages, then the recoupment claim would be superfluous. Second, it appears that all of the prior recoupment decisions in this circuit have involved some sort of an agency relationship. *See, e.g., Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Prods., Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976) (involving the premature termination of a distributorship agreement); *Burton v. Hitachi Am., Ltd.,* 504 F.2d 721, 722–24 (7th Cir.1974) (involving a distributorship agreement for automobiles); *P.S. & E., Inc. v. Selastomer Detroit, Inc.,* 470 F.2d 125, 126–27 (7th Cir.1972) (involving a distributorship agreement for packing seals and rings); *Fargo Glass & Paint Co. v. Globe Am. Corp.,* 161 F.2d 811, 812–13 (7th Cir.1947) (involving a distributorship agreement for gas ranges); *Nichols,* 913 F.Supp. at 1096–97 (involving a distributorship agreement for tires); *Dupage Fork Lift Serv., Inc. v. Machinery Distribution, Inc.,* No. 94 C 7357 (95 C 114), 1995 WL 125774 (N.D.Ill. Mar.15, 1995) (involving a distributorship agreement for automobiles); *Fields v. Feldmann Eng'g & Mfg. Co.,* No. 92 C 1952, 1994 U.S. Dist. LEXIS 11396 (N.D.Ill. Aug. 11, 1994) (Pallmeyer, Mag. J.) (involving the employment contract of a sales representative); *Skinner,* 723 F.Supp. at 55 (involving an employment contract for the promotion of women's apparel); *Cox,* 184 Ill.Dec. at 724, 613 N.E.2d at 1316 (involving franchise agreements for the operation of sandwich shops); *see also Mechanical Rubber & Supply Co. v. American Saw & Mfg. Co.,* 810 F.Supp. 986, 994–95 (C.D.Ill.1990) (dismissing a recoupment claim based on a sales contract that did not create an agency relationship). There may, of course, be a way to reconcile these decisions with the claim asserted by Tibor in the case at hand. Reasonably relying on our comments in *Tibor III,* Tibor did not discuss the relevance of an agency relationship to its recoupment claim in its Response to FNGP's motion to dismiss. Since this is a potentially dispositive issue, we will reserve judgment until both sides have had an opportunity to submit briefs on the matter.

## CONCLUSION

For the foregoing reasons, the FNGP's motion to dismiss Tibor's claim for breach of contract (Count V) is denied. FNGP's motion to dismiss Tibor's claim for recoupment (Count VI) is continued pending resolution of the legal issues discussed in this opinion. Tibor is granted until April 14, 1997, to file a brief responding to FNGP's argument that an agency relationship is a prerequisite to a viable claim for recoupment. FNGP will have until May 2, 1997, to reply to Tibor's response.

## ADDENDUM

The following is an addendum to our March 24, 1997, opinion and order. On March 24 we denied in part and continued in part FNGP's motion to dismiss two of Tibor's claims under Federal Rule of Civil Procedure 12(b)(6). While we denied FNGP's motion to dismiss Tibor's breach of contract claim, we reserved judgment on the propriety of Tibor's claim for recoupment. After noting that cases in this circuit seemed to indicate that an agency relationship is a prerequisite to a viable claim for recoupment, we instructed the parties to submit additional materials discussing this issue. Rather than submitting a supplemental brief, Tibor instead requested leave to voluntarily dismiss its claim for recoupment. In a letter dated April 10, 1997, Tibor advised the court as follows:

On March 24, 1997, you issued a Memorandum Opinion ... which, among other things, requested that the parties provide briefs concerning Defendant FNGP's argument that an agency relationship is a prerequisite to a viable claim for recoupment. As attorneys for Plaintiff Tibor, we have researched the issue, and have concluded that current precedent supports FNGP's argument. Accordingly, we hereby voluntarily withdraw Count VI of Plaintiff's Fourth Amended Complaint (recoupment), and would ask the Court to issue an Order reflecting Tibor's voluntary dismissal of that Count. We ask the Court to dismiss Count VI without prejudice, in the event new or additional authority comes to our attention which would suggest the viability of a recoupment claim in the circumstances presented by this case.

FNGP does not oppose Tibor's request. Accordingly, the court grants Tibor's request to voluntarily dismiss Count VI of the complaint.

This addendum is also designed to serve a second purpose: to clarify the scope of our decision in *Tibor Machine Products, Inc. v. Freudenberg–Nok General Partnership*, 942 F.Supp. 1165 (N.D.Ill.1996) ("*Tibor III*"). In *Tibor III*, we stated that we did not believe that the existence of an agency relationship was a condition precedent to a claim for recoupment. *Id.* at 1175. We reconsidered that proposition at some length in our March 24 opinion, but we stopped short of reversing our decision in *Tibor III*. In light of the events surrounding our March 24 opinion, we now regard the necessity of an agency relationship to a viable claim for recoupment as an open question. We therefore vacate the last full paragraph of *Tibor III*, marked by WESTLAW headnote 19 and appearing on pages 1175 and 1176. The rest of our opinion in *Tibor III* is unaffected by today's order.